No. 90,848

STATE OF KANSAS, *Appellee,* v. NGAN PHAM, *Appellant.*

(136 P.3d 919)

Opinion filed June 16, 2006.

*Ricklin R. Pierce*, of Ricklin R. Pierce, Chartered, of Garden City, argued the cause and was on the brief for appellant.

*Brian R. Sherwood*, assistant county attorney, argued the cause, and *John P. Wheeler, Jr.*, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: For Ngan Pham's involvement in actions against the Giang Nguyen family on November 11, 2002, he was convicted of first-degree felony murder, aggravated kidnapping, five counts of kidnapping, six counts of aggravated robbery, aggravated burglary, conspiracy to commit kidnapping, and conspiracy to commit aggravated burglary. He was sentenced to a life sentence plus 1,306 months, the maximum sentence allowed under Kansas law. This court hears his appeal pursuant to K.S.A. 22-3601(b)(1) (maximum sentence of life imprisonment imposed). Our opinion concerning one of his coconspirators, Giang Nguyen, who was tried separately, is found in *State v. Nguyen*, 281 Kan. 702, 133 P.3d 1259 (2006).

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the district court err in denying Pham's *Batson* challenge at the conclusion of voir dire? No.

2. Did the district court err in admitting into evidence Pham's statements to law enforcement made without being provided an interpreter? No.

3. Did the district court err in admitting into evidence certain photographs? No.

4. Did the district court err in denying Pham's motion for judgment of acquittal as to the six counts of aggravated robbery because they were multiplicitous? Yes on five of the counts.

5. Were Pham's convictions of conspiracy to commit kidnapping and conspiracy to commit aggravated burglary multiplicitous? Yes.

6. Were Pham's convictions of aggravated kidnapping and felony murder multiplicitous? No.

7. Did the district court err in denying Pham's request for jury instructions on attempted aggravated kidnapping and attempted kidnapping? No.

8. Was Pham's sentence excessive? No.

Accordingly, we affirm in part, reverse in part, and remand for resentencing.

## FACTS

Giang Nguyen and his wife, Bau Tran, lived at 522 Colony in Garden City with their two daughters, Hong and Ann, and their two sons, Thai and Thang. Early in the morning on November 11, 2002, Thai opened the garage door to start his car to go to work. As he stepped out of the garage to walk toward the car, a man came up next to him out of the dark, pointed a gun to his head, and said, "Motherfucker, stand still. I'm going to shoot you." The man pushed Thai back to the garage and made him lie down with his hands over his head. The man put his foot on Thai's back. He then told Thai to get up, and as Thai was entering his house, several men pushed him flat on his stomach and tied his hands behind his back.

From the kitchen, Thai's sister Ann had heard him yell, so she opened the garage door to look for him. Two men approached her and pushed her back into the house. All three men wore black masks and yellow gloves similar to gloves used at IBP, a local meat-packing plant where Ann had worked. Each one pointed a gun at her. They told Ann and Thang to lie down on the living room floor. Giang Nguyen, the father, then came out of the bedroom, and the

masked gunmen forced him to lie down next to the couch in the living room.

Thai's other sister, Hong, was in her bathroom when she heard a voice say, "Lay down. Lay down." She opened her bedroom door to find someone standing immediately outside. That masked man told her to hold her hands up, then pointed his gun at her forehead and took her to the living room. By his voice and eyes, she eventually recognized him as a coworker at IBP who, though unrelated to her father, was also named Giang Nguyen.

Thai's mother, Bau Tran, was still asleep in her bedroom when one of the masked gunmen pulled the covers off her bed, pointed his gun at her head, and said, "Get up." He led her into the living room to join the other five members of the Nguyen family lying on the floor. After one of the masked gunmen—whom witnesses said was not Giang Nguyen—tied up the family with white strips of cloth, he said to another gunman, "Nam, watch them. If they move, shoot them all." He then left the room, leaving "Nam" alone with the family.

Thang looked up from the floor and said, "Nam, what are you doing?" His sister Hong also looked up and said, "Nam, whatever you want to take, take it." Their sister Ann then looked up and recognized the man as Nam, one of her former coworkers at IBP. Ann said, "Nam, let us go."

Thang then made a break for the kitchen, and Nam followed him. Ann got up, opened the front door, and ran out, with Hong following her. The two daughters ran to a neighbor's house and called the police.

While Thai was still lying in the living room, he heard two gunshots. Bau Tran, Thang's mother, then heard Thang say, "My God, I'm dying." The masked gunmen stepped on Thai's back and ran out of the house through the garage door. After looking up, Thai saw them get into a red car and leave. He loosened his hands and ran to the kitchen to call the police, and then saw his brother Thang lying down in the kitchen with his hands over his face. His mother, Bau Tran, joined them.

Thang had been shot twice. One shot, which was almost straight downward, entered the side of his left chest, and eventually lodged

in his right thigh, perforating his lung and other organs. The other shot, which was slightly downward, entered Thang's left back and exited his left chest, then entered and exited his left forearm.

When the police arrived, Bau Tran directed them to her son Thang and pointed out the strips of white cloth the gunmen had used to tie up the family. Because the police told her to sit in the garage, Bau Tran went to her bedroom to get a coat and noticed that her dresser drawer was open. Inside the drawer, her black purse was unzipped and two pieces of jewelry were missing. One of the pieces of jewelry was a necklace with a 1 carat diamond pendant worth $600 belonging to her daughter Ann; the other was a diamond bracelet worth $5,000 belonging to her other daughter Hong. The daughters had worn the jewelry to a party the night before and given it to their mother for safekeeping when they returned home.

Garden City Police collected two live rounds of 9 mm ammunition, as well as two 9 mm shell casings in the Nguyen home. They also found six white pieces of cloth tied in knots matching the description of the victims' bindings. Acting on a tip, later that morning police obtained a surveillance video from a Kwik Shop in Garden City which showed three Asian males later identified as Nam Nguyen, his brother Giang Nguyen, and defendant Ngan Pham entering the store at 4:16:38 a.m. on November 11, 2002.

David Falletti, a KBI special agent, was assigned to look for Ngan Pham. On November 12, the day after the home intrusion, Falletti and Jason Ott, a Liberal detective, found Pham at Tan Tan's Pool Hall in Liberal. Pham was taken to the Liberal Police Department, where Falletti interviewed him.

Prior to conducting the formal interview, Falletti asked Pham if he understood English. Pham replied that he did. When Falletti asked if Pham wanted an interpreter, Pham replied that he did not need one. Falletti provided *Miranda* warnings by having Pham read them aloud from the card to him.

The interview revealed that Pham had been in the United States for approximately 25 years. He owned a blue 1991 Pontiac Firebird, which Falletti located at Tan Tan's Pool Hall. Pham initially indicated that he did not know about the incident. Later, he agreed

to speak with Falletti about what he knew. He told Falletti that he knew Nam Nguyen and Giang Nguyen, who by then had been identified as two of the intruders. Pham explained that he worked at the Farmland beef packing plant in Liberal and Nam and Giang had worked there as well.

According to Pham, around 4 p.m. on November 10, he, Nam, and Giang Nguyen met in the parking lot of the Tan Tan Pool Hall. They discussed obtaining money from a family in Garden City. Pham did not know the family, but Nam had worked with members of the family at IBP and had been at their house before. After discussing what they were going to do, Pham went home.

Pham told Falletti that around 2 a.m. on November 11, he picked up the Nguyen brothers in Liberal in his blue Firebird to go to Garden City. When they arrived, they stopped at a "Quik Trip" (Kwik Shop) and purchased some food items. Pham identified Giang and Nam Nguyen and himself in photographs taken from the Kwik Shop surveillance video. He explained that after driving around Garden City for awhile, they parked in front of the house at 522 Colony between 3 and 4 a.m. Their plan was to steal money, because Pham had been out of a job for a few weeks and was broke. Pham stated that he, Nam, and Giang sat in front of the house for a short amount of time. He conceived the idea of using a knife to cut a white T-shirt into several strips for tying up family members, which Nam did.

According to Pham, he carried a gray .45 caliber pistol, Giang carried a .45 caliber pistol that Pham had given him, and Nam carried a 9 mm pistol of unknown origin. All three men wore black ski masks. As they walked up to the house together, the garage door opened and an Asian male came out. Pham took the man by the arm at gunpoint and told him, "Let's go." The man seemed very scared. Then Pham forced the man to lie down inside the house near the couch and tied his hands with one of the T-shirt strips while Nam stood guard. Giang went to the bedrooms and brought people out to the living room, where Pham tied their hands and made them lie on the floor.

Pham told Falletti that after all the family members were tied up, Nam stood guard over them while Pham and Giang went to a

back bedroom to look for money. On a rough diagram Falletti had drawn, Pham showed Falletti where the living room and the bedroom were. Falletti identified the bedroom as belonging to Ann and Hong. According to Pham, he had been in the bedroom 4 or 5 minutes when he heard gunfire. He ran straight to his car, gave his keys to Giang, and the three men rode to Wichita. The next morning he returned to Liberal.

Numerous times during the interview Pham stated that the purpose of the episode was to get money; he knew nothing about jewelry taken from the residence. He also said that no one had intended any shooting.

Pham told Falletti that the guns he and Giang had used and the ski masks were in his car. After the interview, Falletti obtained a search warrant for Pham's car and executed it on the afternoon of November 12. He found a tan-colored coat lying in the back of the car, similar to a brown coat Pham had been wearing in the Kwik Shop photographs. The search also revealed a fully loaded Ruger .45 caliber pistol, a fully loaded Smith and Wesson 9 mm pistol, a fully loaded Smith and Wesson .40 caliber pistol, an FEC .45 caliber pistol, and a loaded .22 caliber RG Industries revolver. None of the handguns was determined to be the murder weapon. The search also revealed four black ski masks, numerous yellow IBP-style gloves, and water bottles like those purchased at a convenience store.

Pham later filed a motion to suppress this videotaped statement, which the district court denied after an evidentiary hearing. The tape was played for the jury at trial.

The jury found Pham guilty of:

1. First-degree felony murder of Thang whose death occurred during the commission of an inherently dangerous felony, *i.e.*, aggravated burglary;

2. Aggravated kidnapping of Thang, who was shot during a confinement to facilitate the commission of a crime;

3. Five counts of kidnapping for the other members of the Nguyen family who were confined by gunpoint on the living room floor to facilitate the commission of a crime;

4. Conspiracy to commit kidnapping, *e.g.*, by cutting up a T-shirt in the car to eventually be used for binding the victims.
5. Six counts of aggravated robbery for the taking of the jewelry by force or threat from the presence of all six Nguyen family members.
6. Aggravated burglary of the Nguyen residence, *i.e.*, with them in it.
7. Conspiracy to commit aggravated burglary, *e.g.*, by driving together to the Nguyen residence.

The court ordered that the sentences for these convictions be served consecutively, resulting in an aggregate sentence of life (parole eligibility after 20 years), plus 1,306 months.

## ANALYSIS

Issue 1: *Did the district court err in denying Pham's Batson challenge at the conclusion of voir dire?*

After voir dire, Pham, who is Vietnamese, objected to the State's use of peremptory strikes against four allegedly Hispanic venirepersons. The district court overruled his objection. On appeal, Pham admits that the State's peremptory challenges to the two alleged Hispanic persons who had non-Hispanic surnames (J.H. and J.F.) were race neutral and limits his argument to venirepersons J.C. and M.O. The State responds that Pham fails to meet his burden of proving purposeful discrimination.

When we review a challenge under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), concerning the State's use of a peremptory challenge, we ask whether the trial court abused its discretion in determining if the challenged strikes were constitutionally permissible. See *State v. Washington*, 275 Kan. 644, Syl. ¶ 1, 68 P.3d 134 (2003). Discretion is abused only when no reasonable person would take the view adopted by the trial court. The defendant bears the burden of establishing such an abuse of discretion. *State v. Sanchez-Cazares*, 276 Kan. 451, 454, 78 P.3d 55 (2003).

We further specified the framework for analyzing the issue in *Washington*, 275 Kan. 644, Syl. ¶ 2:

"The *Batson* analysis involves a three-step process. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. In this second step, the prosecutor is only required to put forth a facially valid reason for exercising a peremptory strike to satisfy the second step of the *Batson* analysis. Finally, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination."

The standard of review of the first step—the prima facie showing on the basis of race—is a question of legal sufficiency subject to plenary review. *State v. Bolton*, 274 Kan. 1, 9, 49 P.3d 468 (2002).

Regarding the second step—the prosecutor's burden to show a race-neutral explanation for striking the jurors in question—it does not demand a prosecutor's explanation that is persuasive, or even plausible, but merely facially valid. See *State v. Vargas*, 260 Kan. 791, Syl. ¶ 3, 926 P.2d 223 (1996). Further, unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. Accordingly, the ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike. *State v. Vargas*, 260 Kan. 791, Syl. ¶ 3.

Finally, the standard of review of the third step—the trial court's decision on the ultimate question of whether the defendant has carried the burden of proving purposeful discrimination—is greatly deferential because the determination is factual. *State v. Walston*, 256 Kan. 372, 379, 886 P.2d 349 (1994).

" 'Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding will "largely turn on evaluation of credibility." [Citation omitted.] *In the typical peremptory challenge inquiry, the decisive questions will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.* There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. . . . [the evaluation of which] lies "peculiarly within a trial judge's province." [Citations omitted.]' " *Walston*, 256 Kan. at 379 (quoting *Hernandez v. New York*, 500 U.S. 352, 364-65, 114 L. Ed. 2d 395, 111 S. Ct. 1859 [1991]).

We begin by acknowledging that Pham, who is not Hispanic, has standing to raise a *Batson* challenge based upon the striking of Hispanic venirepersons. See *State v. Edwards*, 264 Kan. 177, 193,

955 P.2d 1276 (1998) (defendant need not establish that he or she is a member of a cognizable minority group because the focus is on the individual rights of jury members not to be excluded on the basis of race or gender).

Next, Pham must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Although the district court correctly stated that Hispanics are an ethnic, not racial, group, this court previously has considered the exclusion of Hispanics in the *Batson* analysis. See *State v. Arteaga*, 257 Kan. 874, 878, 896 P.2d 1035 (1995). We conclude that Pham made a prima facie showing that J.C. and M.O., who are Hispanic, were struck for that reason.

In turn, the State offered the district court its race-neutral reasons for the peremptory strikes of J.C. and M.O. The State pointed out that during voir dire J.C. did not answer any questions from the State or the defense, even with so much as a nod of the head, demonstrating that he either was not listening or simply had no interest in being in the courtroom and in assisting in finding a jury. The State cited one example it felt would directly have affected J.C. He is a liquor store clerk and the only one working at the store during the day but failed to respond when the panel was asked if there were any pressing personal business or work-related matters that would make it difficult for anyone to attend the trial for the next 3 to 5 days.

As for M.O., the State pointed out that she had limited abilities to communicate in English, that she stated she was uncomfortable sitting on the jury because she did not know if she could adequately express her opinions to other members of the jury, and because she might have difficulty understanding written documents and medical testimony.

In reply, Pham argues that the State's reason regarding J.C.'s nonresponsive body language should be viewed with skepticism, citing *State v. Hood*, 245 Kan. 367, 780 P.2d 160 (1989). There we stated:

"Hostility toward the prosecution, as evidenced by oral responses, tone of voice, sitting with arms crossed, leaning forward when defense counsel conducts voir dire, or leaning back while the prosecution asks questions, is a matter which the

trial court may take into consideration in determining whether the prosecutor has a valid and neutral reason for striking the juror. Normally, the trial court's decision will be made immediately after voir dire and the trial court will have the benefit of having just observed the prospective jurors and having heard the questions and answers. Again, however, the trial judge must be particularly sensitive when body language, *alone,* is advanced as a reason for striking a juror of the defendant's race." (Emphasis added.) 245 Kan. at 374.

Body language was not the sole reason advanced by the State for striking J.C., however. The State offered that J.C. failed to answer any questions, particularly one that appeared to be especially relevant to his work situation.

Pham replies that the State did not strike all the prospective jurors who failed to respond to questions from counsel. Citing *State v. Walston,* 256 Kan. 372, 381, 886 P.2d 349 (1994), he argues the similarity of white jurors who were not challenged should be included in the evaluation in determining whether the State's reason is legitimate or merely a pretext for a true discriminatory motive. The district court, however, should consider that factor only if it is brought to the district court's attention. 256 Kan. 372, Syl. ¶ 4. The burden of creating a record of relevant facts belongs to the defendant. 256 Kan. at 382. Here, Pham did not raise to the district court the similarity of white jurors who were not challenged, so this court has no basis for considering this argument on this record.

Regarding M.O., Pham argues that there were no written documents or medical testimony presented at trial which were beyond her comprehension. There is no record of M.O.'s level of comprehension, however, only that she could understand English and that she was uncomfortable with her ability to explain her opinions to others. We conclude this is a sufficiently race-neutral ground for excluding a potential juror. See *State v. Smith,* 352 N.C. 531, 548, 532 S.E.2d 773 (2000) (to assure that defendants be judged fairly and impartially, a juror must, at the very least, have sufficient proficiency in the English language as to enable him or her to fully comprehend the testimony and the court's instructions and to fully and effectively participate in the jury's deliberations).

Pham fails to show that the district court abused its discretion in determining that the State's strikes of venirepersons J.C. and M.O. were constitutionally permissible.

*Issue 2: Did the district court err in admitting into evidence Pham's statements to law enforcement made without being provided an interpreter?*

Pham objects to the admission of statements he made to the police, *i.e.*, agent Falletti, because they were taken without an interpreter in violation of K.S.A. 75-4351(e). The State responds that although English is not Pham's primary language, the statements were voluntarily and understandingly made.

In reviewing a trial court's decision regarding the suppression of a confession, an appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard. *State v. Swanigan*, 279 Kan. 18, Syl. ¶ 1, 106 P.3d 39 (2005).

Furthermore, in determining whether a confession is voluntary, a court looks at the totality of the circumstances, including the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. *Swanigan*, 279 Kan. 18, Syl. ¶ 2. An additional circumstance for consideration is the accused's fluency in the English language. *State v. Garcia*, 243 Kan. 662, Syl. ¶ 8, 763 P.2d 585 (1988). The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. *Swanigan*, 279 Kan. 18, Syl. ¶ 2.

As Pham points out, K.S.A. 75-4351(e) states that a qualified interpreter shall be appointed for persons whose primary language is one other than English "prior to any attempt to interrogate or take a statement from a person who is arrested for an alleged violation of a criminal law of the state or any city ordinance."

We designated this statute's place in the confession analysis in *State v. Zuniga*, 237 Kan. 788, 791-92, 703 P.2d 805 (1985), stating:

"K.S.A. 75-4351 and the sections that follow it provide the machinery for the selection, appointment and compensation of interpreters under various circumstances. They authorize the expenditure of public funds for that purpose. The statutes do not contain any sanctions for violations thereof. Suppression is a severe sanction, much criticized. While the purpose is to encourage peace officers to

follow statutes or constitutional guidelines, it may prevent otherwise proper evidence from being introduced in the case at hand.

. . . .

"The purpose behind K.S.A. 75-4351(e) is to ensure that there is clear communication between one who is in custody and the officers who are questioning him. *The statute does not state a rule of evidence. Whether or not an interpreter is appointed and is present at the taking of the statement, the trial court must still determine whether an in-custody statement was freely, voluntarily and knowingly given, with knowledge of the Miranda rights. That determination must be based upon the totality of the circumstances.*" (Emphasis added.)

We affirmed in *State v. Nguyen*, 251 Kan. 69, 74-75, 833 P.2d 937 (1992), that the absence of an interpreter is not dispositive of the confession's admissibility:

"When an in-custody statement is taken in English from an accused whose primary language is not English, but who also speaks English, failure of the officers to have an interpreter in attendance pursuant to K.S.A. 75-4351(e) does not vitiate the statement if it was freely, voluntarily, knowingly, and understandingly made with full knowledge of the *Miranda* rights." (Citing *State v. Garcia*, 243 Kan. 662, Syl. ¶ 9, 763 P.2d 585 [1988].)

In the instant case, the district court held a hearing on the voluntariness of Pham's statement. After hearing testimony from Detective Jason Ott, Agent David Falletti, and the defendant; hearing arguments; and watching the videotape of the interrogation, the district court ruled that the statement was freely and voluntarily given. As a basis for this legal conclusion, the court made the following findings:

"1. The defendant filed a motion seeking to quash the taped interview of the defendant. The plaintiff filed a motion for a *Jackson v. Denno* hearing regarding the same taped interview. Testimony was received and arguments were heard. The court took the matter under advisement so as to view the tape.

"2. The interview took place in an interview room at the police department in Liberal, Kansas. The defendant was supplied with water and was helped in notifying his employer of his whereabouts. There was no evident physical discomfort during the interview. The defendant had been in the United States approximately 25 years and had previously served time in the Kansas Prison system for approximately 19 years. At the time of the interview the defendant had full time employment in the meat packing industry in Liberal, Kansas. The interview was in English and lasted approximately 2 hours. English was

not his native language. There is no contention on the part of either party that this is not a custodial interrogation.

"3. Before the interview, the defendant read the *Miranda* warning and indicated that he understood the warning. When he read the warning, the defendant occasionally paused to correct his pronunciation of the words on the form. The wording on the form was in common language of ordinary meaning.

"4. During the entire session the responses were fairly quick and were appropriate to the questions asked. Although the defendant spoke with a heavy accent with some difficulty in pronunciation, minor syntax problems, and other minor word usage problems, the tape reveals no substantial presence of evident misunderstanding in the conversation, questions and answers.

"5. The defendant contended that although he reads and speaks English that he understands only about 30% of the words. The taped interview, taken in toto, does not support this contention. Again, there is no evidence of any substantial misunderstanding during the interview or during the reading of the *Miranda* warning. The defendant's answers and statements were relatively quick and appropriate to the question asked or the situation at hand.

"6. It was evident during the interview that the defendant knew of his rights. This was shown when the defendant, at the end of the interview, after giving consent to search his vehicle and place of abode and being told he was being arrested for aggravated burglary and robbery, said that he did not have any money and needed a lawyer.

"7. The defendant contends that the explanation of relatively complicated right-to-search-form by the interviewer was proof that the *Miranda* warning needed more explanation. While it is true that the interviewer explained the consent to search form, it is not clear to the court how this proves that the *Miranda* warning should have been explained in detail. Much of the conversation around the consent to search appeared to be about just exactly what was to be searched and how. The *Miranda* warning need no such explanations.

"8. During the interview, upon several occasions, the interviewing KBI agent exhorted the defendant to tell the truth. There were, however, no promises made by the agent as to any leniency or deals.

"9. It is evident from the totality of the conversation and interview that the defendant had an English language capacity to understand the plain words of the *Miranda* warning. There is no per se rule requiring an interpreter for a person whose native language is not English. The test is whether or not English is sufficiently understood by the defendant to understand the plain language of the *Miranda* warning. As such, the state has satisfied the burden. Additionally, it is evident from the totality of the conversation and all of the factors surrounding the interview that the waiver of rights and his subsequent statements were the product of the free and voluntary will of the defendant."

The district court's findings are supported by substantial competent evidence contained in the videotaped statement and the

testimony of Ott and Falletti at the suppression hearing. See *State v. Swanigan*, 279 Kan. 18, Syl. ¶ 1, 106 P.3d 39 (2005). Falletti testified he went over the *Miranda* rights with Pham by having him read out loud each of the five lines from the *Miranda* card. After each line was read by Pham, Falletti asked Pham if he understood, to which Pham applied in the affirmative.

The videotape shows throughout that Pham was able to understand and converse with Falletti in English. Among other things, Pham demonstrated that he understood by providing numerous specific details during the 2-hour interview about the events of the morning of the crime.

Falletti also testified that before taping began he asked Pham if he wanted an interpreter, but Pham stated he did not need one. Ott confirmed that Falletti asked if Pham needed an interpreter. Ott testified that Pham told Falletti he had been in America for over 20 years, he understood English, and he did not need an interpreter. While Pham denies these and other comments attributed to him, this court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Swanigan*, 279 Kan. at 23.

Under the totality of the circumstances, including the absence of an interpreter, we can independently conclude as a matter of law that Pham's statements were made freely, voluntarily, knowingly, and understandingly with full knowledge of his *Miranda* rights. See *State v. Garcia*, 243 Kan. 662, Syl. ¶ 9, 763 P.2d 585 (1988). See also *Swanigan*, 279 Kan. 18, Syl. ¶ 1 (whether confession is voluntary is conclusion of law).

Issue 3: *Did the district court err in admitting into evidence certain photographs?*

Pham objected to the admission of photographs taken from the surveillance video tape at the Kwik Shop. At trial, and now on appeal, he argues a lack of foundation because the store clerk, who was present at the time of Pham's appearance recorded on the tape, did not testify. As a result, he alleges no one could testify that the resultant photographs were accurate depictions of what had occurred in the store. He does not dispute their relevance, our

threshold determination on admissibility of evidence. See *State v. Meeks*, 277 Kan. 609, 618, 88 P.3d 789 (2004). The State argued that a general foundation for the photographs had been met, and the district court agreed.

In attempting to lay foundation for the photographs, the State offered testimony from Dawn Walker, the assistant manager at the Kwik Shop. Walker testified that she came to work at 6 a.m. on November 11, 2002. At 6:30 a.m., a police officer came in and asked for videotape from the store's security cameras. According to Walker, the Kwik Shop has surveillance cameras that record onto a tape, the recording equipment is locked away in the back room, and only employees have access to the area. Walker unlocked the back room, stopped the tape, pulled it out, and gave it to the officer without reviewing it. She testified that the date appearing on the tape is accurate, but the time is an hour off due to daylight savings time.

As a further foundation effort, Officer Brian Ruder testified that he watched portions of the surveillance tape frame by frame and took still photographs of three Asian males whom he saw on the tape. He testified to the process by which he took the still photographs and that they accurately depicted what he saw on the videotape.

Although no Kansas case is directly on point, *State v. Suing*, 210 Kan. 363, 502 P.2d 718 (1972), provides some guidance. There, this court considered photographs of a getaway car, which were admitted even though no one testified that the photographs were " 'true and accurate reproductions' of the car, *i.e.*, the 'magic words' were lacking." 210 Kan. at 364. We held that the real issue as to the photographs was not whether they accurately portrayed the automobile, but whether the automobile portrayed was the one used in the robbery. Although none of the several witnesses who identified the pictures was specifically asked if they were "fair representations" of the car, it was apparent that they were. 210 Kan. at 365. The court summarized various witnesses' testimony in which they stated that the car in the photographs was the same car they had observed that night during and after the robbery and when stopped by police. "The clear implication is that the like-

nesses were good enough for the witnesses to identify the car. We think that was all that was required, considering the limited purpose for which the pictures were offered." 210 Kan. at 365.

Similarly, in the instant case, the Kwik Shop photographs were used to identify Pham as the person accompanying Giang and Nam Nguyen, both of whom had been identified by several of the victims as two of the gunmen. Pham was never identified by the victims. As in *Suing*, the real issue was not whether the photographs—or the videotape from which they came—accurately portray Pham, but whether he was the one in the company of the Nguyens. Pham admitted to Falletti that he was and pointed out himself, and the Nguyen brothers, in the photograph to Falletti. Officer Ruder identified Pham in the photograph as well.

Under these circumstances, we conclude that Ruder's testimony was sufficient foundation to show that the photographs were accurate reproductions of the video stills. We also conclude that Walker's testimony, including the routineness of the surveillance recordings, was sufficient foundation to show that the videotape accurately depicted a certain place (the Kwik Shop), on a certain date (November 11), at a certain time (an hour different from the time stamp). Walker further testified that the recording equipment was accessible only to employees, negating any serious inference that the tape had been subjected to tampering.

Lastly, by our rejection of Pham's argument that his statement to Falletti should have been suppressed, his admission contained in the statement that he was present in the store with the Nguyen brothers early in the morning of November 11, 2001, greatly dilutes the consequences of the photographs' admissibility. In short, they merely confirm his own voluntary and already damaging statement. Their admission, if erroneous, was harmless. See K.S.A. 60-261.

Issue 4: *Did the district court err in denying Pham's motion for judgment of acquittal as to the six counts of aggravated robbery because they were multiplicitous?*

Pham argues that multiplicity bars his convictions of the six counts of aggravated robbery except that of Bau Tran. He further argues that an insufficiency of evidence bars even that count, *i.e.*,

there was no evidence that any one of the three gunmen took the bracelet and necklace from the house.

In a partial concession to Pham's multiplicity claim, the State abandons any argument that convictions on all six counts can survive. It alleges that two convictions—one count for each daughter—should be affirmed because they each lost jewelry. The State also rejects any argument that the convictions are not supported by sufficient evidence, emphasizing it does not have to locate the missing jewelry to prove its case.

*Multiplicity*

Pham argues multiplicity of convictions; whether convictions are multiplicitous is a question of law subject to unlimited review. *State v. Stevens*, 278 Kan. 441, Syl. ¶ 1, 101 P.3d 1190 (2004).

We have stated that multiplicity is the charging of a single offense in several counts of a complaint or information. *State v. Kessler*, 276 Kan. 202, 204, 73 P.3d 761 (2003). The principal danger of multiplicity is that it creates the potential for multiple punishments for a single offense. 276 Kan. at 205. Multiple punishments for a single offense are prohibited by the Double Jeopardy Clause of the Fifth Amendment and by §10 of the Kansas Constitution Bill of Rights. 276 Kan. at 205.

In *State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006), we announced an analytical framework which applies when the issues arise from cumulative punishments imposed in one case. We held that

"[i]n considering a double jeopardy issue, the overarching inquiry is whether the convictions are for the same offense. There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and [if so] (2) By statutory definition are there two offenses or only one?" 281 Kan. at 496.

We elaborated on the first component:

"If the conduct is discrete, *i.e.*, committed separately and severally, the convictions do not arise from the same offense and there is no double jeopardy violation. If the charges arise from the same act or transaction, the conduct is unitary and the second component must be analyzed to see if the convictions arise from the same offense." 281 Kan. at 496.

There, we listed several factors to be considered in determining if conduct is unitary, *i.e.*, if it is the same conduct. They include (1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct. 281 Kan. at 497.

Here, Pham was in one bedroom, opened one dresser drawer, opened one purse contained there, and removed two pieces of jewelry that Bau Than had placed there—one piece belonging to daughter Hong and the other piece belonging to daughter Ann. We conclude this constituted one transaction, *i.e.*, the convictions arise from the same conduct, and proceed to step two of the analysis.

The second component requires us to determine whether, by statutory definition, there are multiple offenses or only one? Because the double jeopardy issue in the instant case arises from convictions for multiple violations of a single statute, *i.e.*, aggravated robbery under K.S.A. 21-3427, the unit of prosecution test is applied. See *Bell v. United States*, 349 U.S. 81, 99 L. Ed. 905, 75 S. Ct. 620 (1955); *Schoonover*, 281 Kan. at 497. Specifically, "the test is: 'How has the legislature defined the scope of conduct which will comprise one violation of the statute?' Under this test, the statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution." *Schoonover*, 281 Kan. at 497. Because there can be only one conviction for each, we ask: "What is the allowable unit of prosecution for aggravated robbery?"

We observe that under K.S.A. 21-3427, an aggravated robbery is: "[A] robbery, as defined in K.S.A. 21-3426 and amendments thereto, committed by a person who is armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery."

In turn, a robbery, as defined in K.S.A. 21-3426, is "the taking of property from the person or presence of another by force or by threat of bodily harm to any person." In short, the statutes establish that an aggravated robbery is committed if a person who is armed

with a dangerous weapon takes property from the person or presence of another by force or threat of bodily harm.

Because the jewelry was not physically taken from the person of any of the victims, the first issue is whether it was taken from the presence of any person. The jewelry was in the bedroom, and the family members were all tied up in the living room. Under similar facts, we have concluded that property was taken from the victim's presence. See *State v. Evans*, 251 Kan. 132, 834 P.2d 335 (1992) (victim tied up in living room and money was taken from her bedroom).

It is unclear from the statute, however, whether the legislature intended for all six family members to be claimed as victims for the robbery of jewelry (a) belonging to only two and (b) taken from the bedroom of a third who was holding the jewelry for safekeeping. Where the legislative intent is unclear, we apply the rule of lenity. See *Bell v. United States*, 349 U.S. at 83 (a separate conviction for each victim under the statute is permissible only if the legislature authorized that unit of prosecution "clearly and without ambiguity"). In the absence of clear legislative intent, the rule of lenity presumes a single physical action harming multiple victims is only one offense.

This approach is consistent with the Kansas multiplicity case law cited by the parties interpreting the robbery statutes after they were enacted under the new Kansas Criminal Code in 1969. See *State v. Shoemake*, 228 Kan. 572, 618 P.2d 1201 (1980); *State v. McQueen*, 224 Kan. 420, 582 P.2d 251 (1978); *State v. Branch & Bussey*, 223 Kan. 381, 573 P.2d 1041 (1978); and *State v. Jackson*, 218 Kan. 491, 543 P.2d 901 (1975). Several decisions have implicitly mentioned the elements test from *Blockburger v. United States*, 284 U.S. 299, 76 L. Ed. 306, 52 S. Ct. 180 (1932), *e.g.*, *State v. Jackson*. While none has explicitly identified the unit of prosecution test mentioned in *Bell v. United States* and *Schoonover*, they have essentially applied it. See, *e.g.*, *State v. Branch & Bussey*.

In *State v. Jackson*, 218 Kan. 491, three men entered Nelson's Pharmacy in Kansas City, Kansas, and at least two were armed with handguns. After ordering those present onto the floor, the trio robbed three people: (1) the pharmacist on duty of money, drugs,

and some deposit slips, all belonging to the pharmacy; (2) a customer of some money; and (3) an employee of money and a pocketknife. The defendant alleged he should not have been charged three times with the same crime. This court disagreed: "While the incident here was one overall transaction, three separate robberies were committed with property of three different persons being taken by threat of bodily harm against three separate individuals." 218 Kan. at 492.

The *Jackson* court additionally stated:

"As appellant correctly points out, the test to be applied in determining identity of offenses is 'whether each requires proof of a fact which is not required by the others.' . . . [T]his case involves three victims, each of whom was robbed, and the evidence required to prove the crime is different as to each. Three separate counts were therefore proper." 218 Kan. at 492-93.

Similarly, 3 years later in *State v. Branch & Bussey*, 223 Kan. 381, this court addressed three men entering the apartment of Joel Bruner in Lenexa, Kansas, with the intention of robbing Bruner of his marijuana. They brandished firearms and forced all occupants to the floor. Defendants Branch and Bussey seized the marijuana and robbed Bruner, his roommate Nelson, and visitor Hudson of their billfolds. The defendants contended that all the robbery counts except one should have been dismissed. This court disagreed:

"The basis for this contention is defendants' belief that only one robbery was committed. They are mistaken. Since each robbery was committed upon a different person it was necessary to prove different facts for each of the charges; thus, the charges were separate and not duplicitous. [Citations omitted.]" 223 Kan. at 384.

The court addressed what effectively was the unit of prosecution analysis by discussing *In re Allison*, 13 Colo. 525, 532, 22 Pac. 820 (1889). There, the Colorado Supreme Court reviewed defendant's argument that his convictions for multiple counts of highway robbery were multiplicitous:

" '. . . Relator was not tried for robbing the stage; each of the indictments charged him with robbing a different individual passenger upon the stage. . . . [E]ven if regarded as a single act, they affected separate objects. And where one unlawful

act operates on several objects, there may be several offenses committed, and so several prosecutions for the same criminal transaction.' " 223 Kan. at 381.

Later that same year in *State v. McQueen,* 224 Kan. 420, the court addressed armed men robbing the Grove IGA store in Wichita. Among other things, they took $5,200 in the presence of five store employees, including manager Larry Wolf. This action formed the basis for one count in the criminal complaint. They also took a .38 caliber Charter Arms revolver from the person and in the presence of Wolf, which formed the basis for another count. The defendants essentially argued multiplicity.

The *McQueen* court agreed with the defendants, stating:

"The state attempts to justify the separate charges by contending there was a lapse of time between the two incidents. When the robbery was in progress, Wolf was confronted in the office by one of the robbers who demanded and received the gun. Wolf was ordered to leave the office and then the money was taken. The state further contends count eleven charges aggravated robbery of the money belonging to Grove IGA, while count twelve separately charges aggravated robbery of a gun belonging to Wolf. These arguments are not persuasive. There was only one store robbery. Both the money and the gun were kept on the store premises in connection with running the business. This court has held ownership of the property taken is not an element of robbery under K.S.A. 21-3426 [Citation omitted.] *Multiple offenses cannot be carved out of a single robbery because of separate ownership of the property taken.*

"The state may not split a single offense into separate parts. When there is one wrongful act it does not furnish a basis for more than one criminal prosecution. [Citations omitted.] The convictions and sentences on count twelve are vacated and set aside." (Emphasis added.) 224 Kan. at 430-31.

In short, *McQueen* appears to be slightly off the path prepared by this court in *Jackson* and *Branch & Bussey.*

Two years after *McQueen* this court decided *State v. Shoemake,* 228 Kan. 572. *Shoemake* contained two points important to our resolution. First, it followed the path prepared by *Jackson* and *Branch & Bussey.* Second, it explained how *McQueen* fit into the overall analysis.

There, while defendant Shoemake apparently waited in a getaway car, his crime partner, Lucas, entered Nigro's supermarket in Kansas City, Kansas. He approached the manager, Lee Trial, brandished a pistol, and demanded money. Manager Trial delivered

money from one cash register. Lucas then took money by force from a store cashier, Frederick Larison, at a different register. Manager Trial was then forced into the office, and more money was taken. The monies were placed in a sack provided by carry-out boy, Michael Jones. On appeal, defendant Shoemake argued there was only one robbery and that the charges and convictions of three separate counts of robbery—of Trial, Larison, and Jones—allowed multiple convictions for a single offense.

Citing *State v. Branch & Bussey* and *State v. McQueen,* this court agreed that the count involving Jones could not stand because no property was forcibly taken from him by Lucas. We affirmed the other two counts of robbery, however, stating:

"Where, in the course of the robbery of a business establishment, several employees are held at gunpoint and compelled by force to deliver to the robber property in the possession or custody of the employee, a separate and distinct aggravated robbery occurs with the taking of property *from each victim.* In the present case, property was taken from the manager, Lee Trial, and from the cashier, Frederick Larison, both of whom were custodians of store property. The forcible taking of such property from these employees constituted separate and distinct aggravated robberies which could be charged in separate counts." (Emphasis added.) 228 Kan. at 577.

In the process, the *Shoemake* court explained its decision in *McQueen* made two years earlier:

"In *State v. McQueen* . . . it was held that multiple offenses could not be charged *where only one person was robbed of items of property belonging to different persons.* In that case, one conviction for aggravated robbery was set aside *where the only victim* was compelled at gunpoint to deliver property belonging to a supermarket and also a gun belonging to himself." (Emphasis added.) 228 Kan at 577.

As mentioned, a synthesis of these four cases demonstrates that under proper circumstances, one transaction can support more than one count of aggravated robbery. See, *e.g., State v. Jackson,* 218 Kan. 491. Here, however, as in *State v. McQueen,* 224 Kan. 420, only one person was relieved of items of property belonging to different persons. Hence, there was only one victim. As a result, as in *McQueen,* only one count may stand, *i.e.,* the count regarding Bau Tran.

*Insufficiency of the evidence*

Pham also argues that the evidence is insufficient to support his conviction for the aggravated robbery of Bau Tran. Specifically, he points to Falletti's testimony that Pham denied taking any items of jewelry from the house, that Pham did not see any jewelry taken by anybody else, and that the jewelry was never recovered. He claims that the only evidence of missing jewelry was the testimony of Bau Tran that she received a necklace from Ann and a bracelet from Hong the night before the incident and that both items were gone from her purse located in her dresser in her bedroom when she went there after the police arrived. The State in turn points to evidence to support the conviction.

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Burhans,* 277 Kan. 858, 871, 89 P.3d 629 (2004). An appellate court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Swanigan,* 279 Kan. 18, 23, 106 P.3d 39 (2005).

Viewed in the light most favorable to the prosecution, the evidence showed that Pham, Nam Nyugen, and Giang Nyugen, each masked and armed with a loaded gun, entered the residence at 522 Colony in the early morning hours. The three gunmen gathered the family from various rooms in the house at gunpoint, forced them to lie on the living room floor, and bound the hands of each family member. Pham and Giang then went through various rooms of the house searching for money. After the gunmen left, Hong's $5,000 diamond bracelet and Ann's $600 diamond pendant necklace were missing from a purse in the dresser drawer of their parents' bedroom. Additionally, Pham admitted to Falletti that he had not worked in a few weeks and needed money; hence, the reason for the intrusion in the Nguyen home.

At the outset, we again observe that an aggravated robbery is committed if a person who is armed with a dangerous weapon takes

property from the person or presence of another by force or threat of bodily harm. K.S.A. 21-3426; K.S.A. 21-3427.

We also observe that the State did not have to prove that Pham was the intruder who took the jewelry. The actions of one robber can be used to prove the elements of the crime against the other. *State v. Gomez,* 234 Kan. 447, 451, 673 P.2d 1160 (1983); *See State v. Johnson & Underwood,* 230 Kan. 309, 311, 634 P.2d 1095 (1981) (under aiding and abetting statute, not necessary for both defendants to possess a gun to justify both being convicted of aggravated robbery).

Finally, we observe that the State did not have to find the stolen items to prove that they were stolen. In *State v. Stephens,* 266 Kan. 886, 975 P.2d 801 (1999), the defendant argued that there was no evidence he took property from the presence of the victim. This court stated: "Under our standard of review, it is sufficient if there was evidence linking Stephens to the crime and there was property missing from the victim's presence." 266 Kan. at 893. Similarly, in the present case, the jewelry was never found, but there was evidence linking Pham to the crime and evidence that the jewelry was missing after the three gunmen were in the house. See *State v. Peckham,* 255 Kan. 310, 342, 875 P.2d 257 (1994) (although victim Hernandez' wallet of money was not recovered, the evidence presented at trial created a reasonable inference that defendant did steal these items as part of his plan when he killed Hernandez).

Though the property was never recovered, a rational factfinder could have reasonably concluded beyond a reasonable doubt that valuable jewelry had been taken from the bedroom by Pham while he was armed with a dangerous weapon.

In light of our holdings on multiplicity and sufficiency of the evidence, the case is reversed and remanded for resentencing on a conviction of one count of aggravated robbery; the remaining convictions of five counts of aggravated robbery are reversed and their accompanying sentences vacated.

Issue 5: *Were Pham's convictions of conspiracy to commit kidnapping and conspiracy to commit aggravated burglary multiplicitous?*

Pham argues that his convictions for conspiracy to commit kidnapping and conspiracy to commit aggravated burglary are multiplicitous because there was just one conspiracy containing various subplots, citing *State v. Mincey*, 265 Kan. 257, 963 P.2d 403 (1998), and *State v. Wilkins*, 267 Kan. 355, 985 P.2d 690 (1999). The State responds that there were two separate agreements to perform two different substantive offenses. The first agreement, to steal money in the Nguyen family home, was made at the pool hall in Liberal on November 11 and partially acted upon via the drive to Garden City. The second agreement, to kidnap the Nguyens, was made in the car outside their home and partially acted upon in cutting the white T-shirt to bind the Nguyen family members.

As previously noted, whether convictions are multiplicitous is a question of law subject to unlimited review. *State v. Stevens*, 278 Kan. 441, Syl. ¶ 1, 101 P.3d 1190 (2004). See *State v. Mincey*, 265 Kan. at 266 (whether a defendant can be convicted of two conspiracies based upon a single agreement to commit two distinct crimes is a question of law over which this court has unlimited review).

As mentioned, in *State v. Schoonover*, 281 Kan. 453, we established a stair-step analysis to determine whether multiplicity exists. First, we determine whether the charges arise from the same conduct. If not, there is no double jeopardy violation. If yes, a second component must be analyzed to see if the convictions arise from the same offense. If the double jeopardy issue arises from convictions for multiple violations of a single statute, the "unit of prosecution" test is applied.

The law of conspiracy does not easily lend itself to this particular analysis, however, especially using "arising from the same conduct" as the threshold question. A single conspiracy can last for years, with many of its substantive offenses being completed during that time, *i.e.*, necessarily involving "different conduct" for each substantive offense. See, *e.g.*, *United States v. DiPasquale*, 561 F. Supp. 1338 (E.D.Pa. 1983) (conspiracy to collect claimed debts by extortionate means lasted approximately 2 years; defendants also convicted of multiple counts of substantive offenses committed on different dates during that span). "Conspiracy is an offense which

continues up to the point of abandonment or success." 2 LaFave, Substantive Criminal Law, § 12.3, p. 286 (2d ed. 2003). As discussed later in this opinion, we begin with a determination of the applicable unit of prosecution, and then proceed to a factual analysis. But first, some background is required.

The seminal case for our approach to the instant case is *Braverman v. United States*, 317 U.S. 49, 87 L. Ed. 23, 63 S. Ct. 99 (1942). There, the defendants were engaged in the illegal manufacture, transportation, and distribution of liquor in violation of a number of internal revenue laws, for which they were charged and convicted on seven counts. Similar to the instant case, each count charged a conspiracy to violate a different internal revenue law, but pursuant to a single conspiracy statute, § 37 of the Criminal Code.

The government conceded that only a single agreement had been proved, and the Court reversed for this reason:

"[T]he precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one." 317 U.S. at 53.

The Court continued:

"The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute, § 37 of the Criminal Code. For such a violation, only the single penalty prescribed by the statute can be imposed." 317 U.S. at 54.

The Court reiterated its *Braverman* holding in *United States v. Broce*, 488 U.S. 563, 102 L. Ed. 2d 927, 109 S. Ct. 757 (1989). After quoting *Braverman,* it stated:

" A single agreement to commit several crimes constitutes one conspiracy. By the same reasoning, multiple agreements to commit separate crimes constitute multiple conspiracies." 488 U.S. at 570-71.

*State v. Mincey,* 265 Kan. 257, was the first time that this court addressed the issue of multiplicity in conspiracies. Mincey was convicted by a jury of, among other things, conspiracy to commit first-

degree murder and conspiracy to commit aggravated robbery. Although the issue had not been raised at the trial court, because Mincey's claim involved only a point of law and was determinative of some issues, this court nevertheless reviewed her argument that "she could not be convicted of two separate conspiracies arising out of one agreement to commit two offenses." 265 Kan. at 259, 266. We held that whether a defendant can be convicted of two conspiracies based upon a single agreement to commit two distinct crimes is a question of law over which we had unlimited review. 265 Kan. at 266.

The *Mincey* court did not recite Kansas' general conspiracy statute, K.S.A. 21-3302, which states at subsection (a):

"A conspiracy is an agreement with another person to commit a crime or to assist in committing a crime. No person may be convicted of a conspiracy unless an overt act in furtherance of such conspiracy is alleged and proved to have been committed by such person or by a co-conspirator."

Nevertheless, this court implicitly interpreted the statute's operative language, "an agreement . . . to commit a crime or to assist in committing a crime," to also mean an agreement to commit *several* crimes. It impliedly did so when it relied upon *Braverman v. United States*, which dealt with a similar statute. See *Wong Tai v. United States*, 273 U.S. 77, 78 n.1, 71 L. Ed. 545, 47 S. Ct. 300 (1927) (Section 37 of the Criminal Code provides: " 'If two or more persons conspire . . . to commit any offense against the United States, . . . and one or more of such parties do any act to effect the object of the conspiracy each of the parties to such conspiracy' shall be fined, imprisoned, or both.").

After discussing *Braverman*, the *Mincey* court concluded:

"A single continuing conspiracy, however diverse its objects, cannot be broken down into component sub-agreements for the purpose of multiple punishments or multiple prosecutions. When separate conspiracies are alleged and both are founded on a general conspiracy statute, the relevant inquiry is whether there existed more than one *agreement* to perform an illegal act or acts." 265 Kan. at 268.

The *Mincey* court held that the convictions of conspiracy to commit first-degree murder and of conspiracy to commit aggravated robbery were multiplicitous because the defendant had known sub-

stantially in advance of the crimes that her son and friend were going to rob someone, and she counseled and advised them to kill the victim if they thought they might be identified and arrested. We therefore affirmed the conviction of conspiracy to commit first-degree murder and reversed the conviction of the less serious offense of conspiracy to commit aggravated robbery.

It is not entirely clear from the opinion whether the State only argued one conspiracy to commit several crimes, in which case *Braverman* controlled the result, or whether this court determined that the facts warranted a conclusion of only one conspiracy. We stated:

"*Braverman,* like the conspiracy alleged against Mincey, has a single agreement to commit several crimes. Here, Mincey conspired to commit aggravated robbery and, if necessary, premeditated murder. Even though there was the possibility of two crimes occurring, there was only one criminal agreement entered into by the defendants." 265 Kan. at 268.

If the *Mincey* court determined that the facts warranted a conclusion of only one conspiracy, it did not specify what factors, if any, it considered in reaching its conclusion. It is also unclear whether the two substantive offenses were discussed in the same general conversation or in different conversations at different times as in the instant case.

Similarly, in *State v. Wilkins*, 267 Kan. 355, the defendant was convicted of conspiracy to commit murder and conspiracy to commit aggravated robbery. Because the issue of multiplicity of the conspiracy charges had not been raised by either of the parties, the court addressed it *sua sponte* to serve the ends of justice and to prevent a denial of Wilkins' fundamental rights. 267 Kan. at 367. After quoting the *Mincey* language set forth earlier in this opinion, this court held that there was only one agreement between Wilkins and Bittle to kill the victim and for Wilkins to take the victim's necklace to Bittle as proof of the killing: "The single continuing conspiracy in this case cannot be broken down into component sub-agreements for the purpose of multiple prosecutions or punishments." 267 Kan. at 367. Accordingly, *Wilkins* reinforced *Mincey's* reliance upon *Braverman* and *Mincey's* lack of reference to the language of the general conspiracy statute, K.S.A. 21-3302. The

*Wilkins* court reversed the jury's conviction of the less serious offense of conspiracy to commit aggravated robbery.

As with *Mincey,* the *Wilkins* opinion is not entirely clear on whether the State only argued one conspiracy to commit several crimes, in which case *Braverman* controlled the result, or whether this court determined that the facts warranted a conclusion of only one conspiracy. If the latter, the court did not specify what factors, if any, it considered in reaching its conclusion. It does appear that the two substantive offenses were discussed in the same general conversation, see 267 Kan. at 358, unlike the facts of the instant case.

We believe that *State v. Bobic,* 140 Wash. 2d 250, 996 P.2d 610 (2000), provides assistance in resolving the conspiracy multiplicity issue because it generally follows Kansas' analytical approach. There, the two defendants and their associates stole vehicles, stripped them of contents and key parts, and stored the stolen items in various facilities. When insurance carriers sold the stripped-out cars at auction, defendants bought the cars to obtain clear title. They then reassembled the vehicles with the stolen parts and sold them.

The defendants were charged with theft, possession of stolen property, and trafficking in stolen property, with one count of conspiracy for each of the three substantive offenses. Both were convicted of multiple counts of possession of stolen property and of each of the three conspiracy counts. They appealed the conspiracy convictions on the grounds of double jeopardy, *i.e.,* multiplicity.

The *Bobic* court acknowledged that the "same elements" test adopted in *Blockburger v. United States,* 284 U.S. 299, 76 L. Ed. 306, 52 S. Ct. 180 (1932), for determining whether a defendant was punished multiple times for the same offense would only apply where the defendant has multiple convictions for violating *several* statutory provisions. Because the defendants were charged with three counts of conspiracy, each under the same conspiracy statute, for acts arising from a single, ongoing, multiobjective agreement, the court decided not to apply the *Blockburger* analysis. "Instead, the proper inquiry is 'what "unit of prosecution" has the Legislature intended as the punishable act under the specific criminal

statute.' " 140 Wash. 2d at 261 (citing, inter alia, *Bell v. United States,* 349 U.S. 81, 99 L. Ed. 905, 75 S. Ct. 620 [1955]).

The court then examined the Washington statute, Wash. Rev. Code § 9A.28.040(1) which, like the statute in *Braverman* and like K.S.A. 21-3302, provided for a crime, an agreement, and a step/ overt act in pursuing the agreement:

" 'A person is guilty of criminal conspiracy when, with intent that conduct con- stituting a crime be performed, he or she agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement.' " 140 Wash. 2d at 262.

Defendants argued under *Braverman* that their single agree- ment—to steal, strip, repurchase, and resell the vehicles for profit—constituted a single violation of the state conspiracy statute, regardless of the number of criminal objects of their agreement. The State responded that the conspiracy statute required it to prove a single specific underlying crime; consequently, the legis- lature intended to punish separately each individual criminal object of the agreement.

The *Bobic* court held that the first step in a unit of prosecution case is to analyze the statute in question. It held that its state statute was remarkably similar to the federal statute construed in *Brav- erman*. It concluded that as in *Braverman*, "the appropriate focus in Washington is on the conspiratorial agreement, not the specific criminal object or objects." 140 Wash. 2d at 265. The court held that its legislature intended that the unit of prosecution for con- spiracy, within the meaning of double jeopardy, to be an "agree- ment and an overt act" rather than the specific criminal objects of the conspiracy.

The court next observed that its analysis of legislative intent did not end its unit of prosecution analysis, however:

"Of necessity, a factual analysis as to the unit of prosecution is necessary because even where the Legislature has expressed its view on the unit of prosecution, the facts in a particular case may reveal more than one 'unit of prosecution' is present. [Citation omitted.] Multiple conspiracies may be charged where the facts of the case support multiple criminal agreements. [Citation omitted.]" 140 Wash. 2d at 266.

The *Bobic* court noted that 21 years earlier the Washington Court of Appeals had

"looked to whether the time, persons, places, offenses, and overt acts were distinct in deciding if multiple conspiracies were present. Similarly the United States Court of Appeals for the Second Circuit looks to see if the following factors overlap in determining whether multiple conspiracies are only a single conspiracy for double jeopardy purposes; the offenses charged; overlap of participants, overlap of time; similarity of operation; existence of common overt acts; the geographic scope of the actions or location of the overt acts; common objectives; degree of the interdependence between the actions. *United States v. Macchia,* 35 F.3d 662, 667 (2d Cir. 1994); *United States v. Korfant,* 771 F.2d 660, 662 (2d Cir. 1985)." 140 Wash. 2d at 266.

After this recitation of factors, the *Bobic* court concluded that Bobic and codefendant Stepchuk

"participated in a criminal enterprise, which included stealing, stripping, repurchasing, and reselling stolen vehicles with an obvious intent to further the goals of their criminal conspiracy. *A single agreement to commit a series of crimes by the same conspirators was present here as each crime was only one step in the advancement of the scheme as a whole.* [Citation omitted.] Thus in light of the statutory direction and the facts of this case, we hold Bobic and Stepchuk committed only one violation of the conspiracy statute." (Emphasis added.) 140 Wash. 2d at 266-67.

The court vacated two of the three conspiracy convictions and remanded, presumably for resentencing.

As mentioned, *Bobic* follows the same analytical path as established by this court in *Schoonover,* as modified because of the United States Supreme Court's earlier conspiracy decision in *Braverman,* and as impliedly followed in *Mincey* and *Wilkins.*

*Bobic* does not indicate whether the car theft conspiracy arose out of one single conversation, or as a result of a later conversation (or conversations) as in the instant case. We consider this but one factor, however, in the calculus. Indeed, the 8th Circuit looks at the totality of the circumstances to determine whether a single conspiracy or multiple conspiracies exist. *United States v. Rounsvall,* 115 F.3d 561, 564 (8th Cir. 1997). This includes "the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts occurred." *United States v.*

*Bascope-Zurita,* 68 F.3d 1057, 1061 (8th Cir. 1995). Most of the other circuits have also adopted a multi-factor analysis, employing many identical or similar factors. See Theis, *The Double Jeopardy Defense and Multiple Prosecutions for Conspiracy,* 49 SMU L. Rev. 269, 299 n.159 (1996) (listing examples).

Here, the jury found Pham guilty of both conspiracies: to commit aggravated burglary and kidnapping. Based upon Pham's statement to Falletti, the cutting up the T-shirt to use for tying up the family was Pham's idea; it apparently did not occur to him until the perpetrators—Pham and the Nguyen brothers—were sitting outside of the victims' Garden City home shortly before they entered to commit their planned aggravated burglary. Pham's statement to Falletti also established that Nam then performed the cutting in the car shortly before they entered the home.

In applying the *Korfant* factors identified in *Bobic* to the instant case, we observe Pham's statement establishes that in both alleged conspiracies the participants were identical and that the times and locations substantially overlapped. See *United State v. Korfant,* 771 F.2d 660, 662 (2d Cir. 1985). The curbside idea and shirt-cutting, as well as entry into the home and the binding of family members, additionally establish that in both purported conspiracies the operations were the same and they shared some of the overt acts, *i.e.,* acts which eventually helped accomplish both the aggravated burglary and the kidnapping. We also observe that the general objectives of both alleged conspiracies were the same, *i.e.,* to steal money. Indeed, Pham repeatedly told Falletti that their only purpose was to steal money.

Finally, we also note the strong presence of an additional *Korfant* factor: the high "degree of the interdependence between the actions." 771 F.2d at 662. Or, as determined by the *Bobic* court, "[a] single agreement to commit a series of crimes by the same conspirators was present here *as each crime was only one step in the advancement of the scheme as a whole."* (Emphasis added.) 140 Wash. 2d at 266. In short, the idea to bind the victims and the actual cutting of the shirt into strips were merely to effectuate the object of the conspiracy, *i.e.,* to facilitate the intruders in their planned burglary of a home early in the morning of a workday when

the family—personally known to Nam Nguyen—would assuredly be present.

We therefore conclude that the two conspiracy convictions are multiplicitous because there was only a single continuing conspiracy, *i.e.*, whose object was to rob the Nguyen family in their home. We reverse the conviction of conspiracy to commit kidnapping and vacate its sentence. We remand for resentencing on the conviction of conspiracy to commit aggravated burglary.

Issue 6: *Were Pham's convictions of aggravated kidnapping and felony murder multiplicitous?*

Pham also argues that the charges of felony murder, based upon the underlying felony of aggravated burglary, and aggravated kidnapping were multiplicitous because the same act of force, *i.e.*, "the fatal gunshot" was the aggravating factor supporting both convictions.

In response, the State argues that in *State v. Grissom*, 251 Kan. 851, 840 P.2d 1142 (1992), the court rejected as a matter of law the defendant's argument that his aggravated kidnapping conviction was multiplicitous with the first-degree murder conviction.

The resolution of this issue—where Pham received multiple convictions of different statutes—is controlled by the analysis in *State v. Schoonover*. There we stated that "the test to determine whether charges in a complaint or information under different statutes are multiplicitous is whether each offense requires proof of an element not necessary to prove the other offense; if so, the charges stemming from a single act are not multiplicitous." 281 Kan. at 495. Because aggravated burglary and aggravated kidnapping each require proof of an element not necessary to prove the other (see K.S.A. 21-3716 and 21-3421), one gunshot may serve as the aggravating factor in both the aggravated burglary (the underlying felony for the felony-murder charge) as well as the aggravated kidnapping.

On a related issue, *Schoonover* also recognized that a legislature can authorize cumulative punishments under felony-murder and underlying felony statutes. We concluded that through K.S.A. 2005 Supp. 21-3436, the inherently dangerous felony statute, "the leg-

islature stated its intent as to when cumulative punishments can be imposed." 281 Kan. at 491. Because K.S.A. 2005 Supp. 21-3436(a)(10) lists aggravated burglary as an inherently dangerous felony, Pham can be punished cumulatively for felony murder and aggravated burglary as the underlying felony. See, *e.g.*, *State v. Dunn*, 243 Kan. 414, 758 P.2d 718 (1988) (convictions for felony murder and underlying offenses of aggravated robbery and aggravated kidnapping are constitutionally permissible).

Accordingly, Pham's convictions of aggravated kidnapping and of felony murder based upon the underlying felony of aggravated burglary are not multiplicitous.

Issue 7: *Did the district court err in denying Pham's request for jury instructions on attempted aggravated kidnapping and attempted kidnapping?*

Pham requested jury instructions for attempted aggravated kidnapping and five counts of attempted kidnapping as lesser included crimes of aggravated kidnapping and five counts of kidnapping. The district court denied the request, noting that the facts indicate that Pham was either guilty of kidnapping and aggravated kidnapping, or he was guilty of nothing at all; there was no evidence reasonably supporting any lesser included offenses, including attempts. It stated:

"[T]hree men came into their home with guns drawn. The people in the home were collected from various parts of the home, made to lie down in one location and had their hands tied. One of the men told another to shoot them if they moved. One of the victims started to move or somehow or other made some movement. Two shots were fired. The victim died as a result of the two gunshot wounds."

On appeal Pham only argues that the jury could have found him guilty of attempted aggravated kidnapping and attempted kidnapping because all six family members were able to free themselves from their bonds.

Our standard of review is well known.

"When a defendant has requested a lesser included instruction at trial, the standard of review for failing to so instruct is whether the evidence, when viewed in the light most favorable to the defendant, supported the instruction. The in-

struction need not have been given if the evidence would not have permitted a rational factfinder to find the defendant guilty beyond a reasonable doubt of the lesser included offense." *State v. Jones*, 279 Kan. 395, Syl. ¶ 1, 109 P.3d 1158 (2005).

We agree with the district court. The uncontroverted evidence demonstrates that the crimes of kidnapping and aggravated kidnapping were completed before Pham and his fellow gunmen fled the Nguyen house. See K.S.A. 21-3420 (*e.g.*, kidnapping is the confining by force or threat with intent to hold a person to facilitate the commission of a crime) and K.S.A. 21-3421 (aggravated kidnapping is when bodily harm is inflicted upon the person kidnapped).

As for Pham's specific contention that the crimes fell short of completion because the family members were able to free themselves, we observe that under Kansas law a victim's ability to escape does not mean that the act of kidnapping did not occur. In *State v. Jackson*, 238 Kan. 793, 800, 714 P.2d 1368 (1986), the defendant argued that the evidence of aggravated kidnapping showed only an attempt because he lacked sufficient control over the victim, *i.e.*, he was not successful in getting the victim locked inside the trunk of his car. This court stated:

"The victim in the instant case was twice dragged by the appellant from inside the stables to the appellant's car, which was backed up to the door outside. While the appellant was not successful in getting her completely inside the trunk, it is clear she was under his control. The fact that the victim was able to escape does not prevent the appellant's conviction for aggravated kidnapping." 238 Kan. at 802.

As a result, the court also rejected defendant's argument that the trial court erred in failing to instruct on attempted kidnapping. 238 Kan. at 803. See also *State v. Little*, 26 Kan. App. 2d 713, 718, 994 P.2d 645 (2000) (rejecting defendant's argument that because he did not do a very good job of binding the hands of the victim who was able to quickly escape from her bonds, he was entitled to a lesser included offense instruction to aggravated kidnapping and kidnapping).

The district court's refusal to instruct on lesser included offenses to aggravated kidnapping and kidnapping was not error.

Issue 8: *Was the sentence excessive?*

Pham argues that his sentence of life imprisonment followed by 1,306 months was an abuse of the district court's discretion and oppressive because the court imposed the maximum sentence for each conviction and ordered that they be served consecutively. He acknowledges that the district court had the authority to sentence him in this way. The State responds that Pham's sentence did not depart from the presumptive sentences and, under *State v. Flores*, 268 Kan. 657, 999 P.2d 919 (2000), Pham does not raise jurisdictional grounds sufficient for appeal.

We agree with the State. There is no departure from the presumptive sentences. And in *Flores*, 268 Kan. 657, this court squarely addressed Pham's issue, stating: "As to crimes committed on or after July 1, 1995, claims of partiality, prejudice, oppression, or corrupt motive do not raise jurisdictional grounds sufficient to allow an appeal of a presumptive sentence." 268 Kan. at 659. See K.S.A. 21-4721(e)(1).

The judgment of the district court is affirmed in part and reversed in part:

1. Reversed and remanded for resentencing on a conviction of one count of aggravated robbery; the remaining convictions on five counts of aggravated robbery are reversed and their accompanying sentences vacated.
2. Reversed and remanded for resentencing on a conviction of conspiracy to commit aggravated burglary; the conviction for conspiracy to commit kidnapping is reversed and its accompanying sentence vacated.
3. Affirmed in all other respects.