IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 106,741

STATE OF KANSAS,
*Appellee*,

v.

THOMAS EUGENE JENKINS,
*Appellant*.

SYLLABUS BY THE COURT

1.

When a defendant challenges the sufficiency of the evidence, an appellate court reviews the evidence in a light most favorable to the State and upholds the conviction if it is convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. The court does not reweigh the evidence or pass on the credibility of witnesses.

2.

A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference.

3.

When considering whether a new trial is warranted based on juror misconduct, the trial court first considers whether there was a fundamental failure in the proceeding. If a fundamental failure did occur, the trial court moves to the second step and considers whether the party benefitting from the failure has shown the trial can continue without an

injustice, meaning the party has shown beyond a reasonable doubt that the failure did not affect the outcome of the trial. An appellate court reviews the trial court's decision in two parts. It reviews the conclusion on whether a fundamental failure occurred for an abuse of discretion. As for the second question—whether any failure resulted in injustice—an appellate court does not review the district court's decision for abuse of discretion but considers the entire record and performs its own constitutional harmless error review.

4.

If a court failed to suspend proceedings and conduct a competency hearing in accordance with K.S.A. 22-3302, a retrospective hearing may rectify the error.

5.

To determine whether it is feasible to retrospectively determine the defendant's competency at the time of the trial, a court considers the following four factors: (1) the passage of time; (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations; (3) any statements by the defendant in the trial record; and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with the defendant before and during trial, including the trial judge, counsel for both the government and the defendant, and jail officials.

Appeal from Saline District Court; JEROME P. HELLMER, judge. Opinion filed July 27, 2018. Affirmed.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, argued the cause and was on the brief for appellant.

*Ellen H. Mitchell*, county attorney, argued the cause, and *Derek Schmidt*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Thomas Jenkins appeals from his convictions for first-degree murder, two counts of aggravated burglary, theft, three counts of criminal threat, two counts of domestic battery, and criminal restraint. Finding no error on the part of the trial court, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On June 13, 2009, at approximately 6 a.m., officers responded to a call about potential burglaries of two different apartments in a complex at 1012 Johnstown in Salina, Kansas. When the officers arrived, Benjamin Friedman informed them that someone had burglarized his apartment and stolen some of his electronics. The officers inspected a second apartment, occupied by Alfred Mack and Jason Hartfield, and noticed damage to the front door. Upon entering that apartment, the officers found Mack's body lying on the floor. Mack had been killed by a gunshot wound to his chest.

The State theorized that Thomas Jenkins colluded with Willie Parker, Justin Letourneau, and Travis Graham to burglarize Mack's and Friedman's apartments and that Parker shot and killed Mack as Parker and Jenkins carried out the burglary in Mack's apartment. The State charged Jenkins with first-degree murder under theories of premeditation and felony murder, solicitation to commit first-degree murder, two counts of aggravated burglary, and theft. The State also charged Jenkins with three counts of criminal threat, two counts of domestic battery, and criminal restraint based on events that took place after June 13, 2009.

3

The facts supporting those charges are as follows:

On June 12, 2009, at 10 p.m., Mack and Hartfield were both at home. At 12:30 a.m., a Pizza Hut employee delivered a food order to their apartment. The employee testified that there was nothing unusual about Mack's front door. Hartfield ate with Mack and left the apartment around 12:45 a.m.

On the same evening, Friedman went to a movie with his girlfriend around 9 p.m. and then returned home to his apartment. When he arrived home, he had three house guests—Todd Gribble, Jacob Ward, and Logan Bohochik. Friedman was in bed by 12 a.m.

At 2:09 a.m., officers responded to a call about a loud party at Friedman's apartment. Gribble and Ward left after the officers arrived. The officers left the apartment at 2:35 a.m. and Bohochik locked the front door and went to bed in one of the bedrooms. Gribble, Ward, and Bohochick all testified that Friedman's television, movies, and gaming equipment were in the apartment when they left or went to bed.

Nathanial Johnson lived with Donyell Smith in another apartment in the same complex. Fifteen to twenty minutes after the police left Friedman's apartment, Johnson saw Jenkins outside his apartment window and went to speak with him. During the conversation, Jenkins pointed towards an open sliding door on the balcony of Friedman's apartment. Johnson told Jenkins that the people who lived there had been partying and were probably asleep. Smith testified that sometime after the police left Friedman's apartment and before she went to bed, she saw Jenkins with a black man and a white man outside the apartment she shared with Johnson. Parker is black; Letourneau and Graham are white.

Shortly after 4:45 a.m. on June 13, Friedman heard a loud bang and someone rushing down some stairs. Friedman went to his living room and noticed the sliding door to the balcony was open. He also noticed his flat screen television, some DVDs, some video games, his PlayStation 3, and his car keys (to a car that did not run) were missing. Friedman later found his keys in his vehicle.

After discovering his property was missing, Friedman went to the front door of Mack's apartment and noticed it looked like someone had shattered the door lock. He knocked on Mack's door, but no one answered. Friedman called 911 at 5:17 a.m.

Officers arrived at Mack's apartment sometime between 5:55 and 6 a.m. Mack's door was not completely shut, there was a shoeprint on the door, and the strike plate was on the ground. The letters in the shoeprint spelled "Servus." When the officers knocked on the door, it opened, and they saw Mack's body on the floor. Upon entering, one of the officers observed a single shell casing from a .22 caliber bullet just inside the door.

At trial, the State tried to establish that Jenkins had decided to break into Mack's apartment the day before Mack's death to steal money and drugs. Stanley McSwain testified that the day before Mack's death, McSwain and Charles Bates were with Jenkins. McSwain heard Bates tell Jenkins "I've got a lick for you." McSwain understood this to mean "a way to get over on somebody." Bates said that "the lick" was on Johnstown and the occupants would be out of town for a concert. McSwain understood Bates to be referring to the Johnstown apartment complex. An investigator testified that McSwain told him Bates had provided this information because Jenkins had been telling the men that he was worried about money. The investigator also testified that Bates wanted a television in return for the tip. Bates denied having this conversation or meeting with Jenkins and McSwain when he testified at trial.

The State argued to the jury that Jenkins had kicked in Mack's door to facilitate the burglary. It used statements and testimony from Kendra Jenkins (Kendra), Jenkins' wife, to support this argument. At trial, the State introduced a pair of boots with a sole that spelled "Servus"—the same marking in the footprint on Mack's door. Kendra testified that Jenkins wore a pair of identical boots when he worked at Russell Stover. An investigator testified that Kendra told her Jenkins tried to burn his work boots a few days after Mack's death.

The State built much of the remainder of its case on comments that Kendra made during police interviews and on the testimony of Hassan Williford, the father of Kendra's son. An investigator testified that Kendra told her that on June 13, Jenkins, Parker, and Letourneau were at her house when she arrived home sometime after 2 a.m. with her friend, Jackie Colvin. Kendra and Colvin eventually left and met up with Williford. The three of them made various stops before Kendra and Williford parted ways with Colvin and went for a drive.

Sometime between 4 and 5 a.m., Kendra received a phone call. She told Williford he needed to be quiet because it was Jenkins calling. Williford testified that he could hear both sides of the conversation during this phone call because the volume was on the loudest setting. Williford heard Kendra ask the person on the phone what he was doing, and the person responded "sitting outside the place" and that "he had to get off the phone because he was—he was about to go handle what he had to handle and he'd call her back when he got done." The person called back 15 to 20 minutes later. Williford testified that Kendra asked the caller if he had done what he was going to do, and the caller said "'[y]eah, that he got some miscellaneous objects from whatever he was going to do, and for her to meet him back at the house because they had to get rid of some things.'" Williford also heard the person say that "'[s]ome things got kicked off but I took care of the situation.'"

6

Kendra returned home from her drive with Williford sometime between 6 and 7 a.m. and saw Jenkins, Parker, and Letourneau in her living room. Kendra went to bed and, when she woke up, the men were not there.

Kendra confirmed the occurrence of some of these events during her trial testimony, but could not recall them all, and remembered some of them differently. Colvin eventually confirmed that she had been with Kendra and Williford on June 13, but she first told investigators that Jenkins had been with her and Kendra from the time the women returned home from the bars until 5 or 6 a.m. One of investigators testified that Colvin told him she lied because Jenkins "needed an alibi." Colvin testified that she lied because Kendra had asked her to but also because she thought her husband would be less angry if she was out with a married couple.

Kendra Yanik-Ducharme, the common-law wife of Letourneau, and Tiffany Wellman, the mother of Parker's son, also testified for the State. Yanik-Ducharme testified that Letourneau woke her in the morning of June 13 when it was still dark outside and he had television and a PlayStation 3 with him. The television remained at her house for a few days and then Parker and Letourneau took it to Wichita.

At the time of Mack's death, Parker lived with Wellman. Wellman testified that when she woke up on June 13, Parker, Letourneau, and maybe Letourneau's brother, Travis Graham, were at her house. Parker and Letourneau eventually left but returned later in the day with a PlayStation and movies.

On June 19, 2009, police received a new lead. On that day, an officer was dispatched to Salina Regional Health Center, where she found Letourneau unresponsive in the passenger seat of a car. Parker was standing by the car and told the officer that he

7

had killed Letourneau. Police obtained a warrant to search the car and Parker's house. An evidence technician found a .22 Super X cartridge case in the car. When an officer searched Parker's residence, he found .22 caliber Super X shells and a PlayStation 3. The serial number on the PlayStation matched the serial number on the PlayStation removed from Friedman's apartment. At trial, a forensic scientist of the KBI lab would testify that the cartridge case at Mack's apartment and the cartridge case in the car were fired from the same gun.

An investigator interviewed Jenkins on June 27, 2009. Jenkins told the investigator that he was close to Letourneau and Parker and he also knew Graham and Bates. Jenkins stated that his last job had been three weeks earlier, at Russell Stover. When questioned about his activities on June 12 and June 13, Jenkins said he had been home when Colvin and Kendra returned from the bars around 1:30 a.m. and that the three of them then left together to get Kendra's car from the bar. Jenkins told the investigator that they all returned home and then Kendra and Jackie left again. Jenkins said that Letourneau and Parker came over to his house on June 13, 2009. Jenkins also stated that he did not know Mack and did not know where Johnstown Street was.

On September 14, 2009, Kendra contacted the police and told them she had recently decided to leave Jenkins and feared for the lives of herself, her son, and her parents. She described several incidents that had occurred since Mack's death. On August 12, 2009, Jenkins pulled her out of a car by her hair and demanded she contact police and tell them she had lied to them. In late August, Jenkins punched Kendra in the mouth when he discovered her journal. Jenkins called her a "snitch bitch" because of the things she had written in the journal. Sometime after June 13, but before she contacted police, Jenkins locked Kendra and her son in a closet because of "the information that she knew regarding the Al Mack homicide." Jenkins had friends come over after he locked Kendra in the closet because "she was going to turn him in for the information that she knew"

8

and he wanted the friends "to hear what she was going to tell the police so then that way if he was arrested or whatnot somebody knew that it was her that had snitched on him." During the same period, Jenkins also threatened to kill Kendra and her son and told Kendra's son that he was going to kill his mommy. These incidents would serve as the basis for the State's charges of criminal threat, domestic battery, and criminal restraint.

The State filed a complaint against Jenkins on October 12, 2009. On March 21, 2011, a jury found Jenkins guilty of first-degree murder under theories of premeditation and felony murder, of aggravated burglary of Mack's apartment, aggravated burglary of Friedman's apartment, theft of the items missing from Friedman's house, two counts of criminal threat against Kendra, one count of criminal threat against Kendra's son, two counts of domestic battery against Kendra, and one count of criminal restraint of Kendra. The district court sentenced Jenkins to life imprisonment with the possibility of parole in 20 years for the first-degree murder conviction. The district court imposed prison sentences of 136 months and 34 months for the two aggravated burglary convictions, 6 months for the theft conviction, and 6 months for each the three criminal threat convictions, all to run consecutive to the murder conviction. For the two convictions of domestic battery and one conviction of criminal restraint, the district court sentenced Jenkins to jail time for periods of 6 months, 6 months, and 12 months, to run concurrent with the other convictions. Jenkins appealed.

*Juror Misconduct*

On December 30, 2011, while the case was on appeal, the prosecutor in Jenkins' case sent a letter to Jenkins' trial counsel and Jenkins' appellate counsel informing them that, on December 20, 2011, she had received a poinsettia, some chocolates, and some cards from one of the jurors (G.M.) in Jenkins' case. The prosecutor's investigator returned the gifts and notes to G.M. along with a letter from the prosecutor explaining

9

that she had received the gifts but could not keep them because he had been a juror in the case.

On January 17, 2012, Jenkins filed a motion in this court to "suspend briefing schedule and to remand to the district court for purposes of a hearing on juror misconduct." We retained jurisdiction and granted the motion on January 30, 2012.

In February 2012, G.M. left a message with the receptionist in the prosecutor's office wishing the prosecutor a Happy Valentine's day.

The district court held a hearing on May 31, 2012. It heard testimony from the prosecutor; G.M.; and Michael Rogers, an investigator with the Saline County Attorney's office. The prosecutor testified about the correspondence and gifts she had received from G.M. She explained that she had no contact with G.M. during the trial and did not see him again until September 2011, when she was trying another case and saw G.M. in the hallway of the courthouse. G.M. testified that he and his wife split up in June 2011 and he saw the prosecutor in the courthouse when he was waiting for his divorce lawyer. G.M. testified that he had no feelings for the prosecutor during the trial and showed her side no favoritism. Based on this testimony, the district court found there was no evidence of juror misconduct.

In February 2013, the prosecutor sent another letter to trial and appellate counsel informing them that G.M. had again sent her flowers and chocolates. On April 19, 2013, on Jenkins' motion, we again retained jurisdiction and remanded the case to the district court for another determination on whether juror misconduct had occurred.

At the second hearing, the district court once more heard testimony from the prosecutor and G.M. G.M. testified that he did not begin to think about being friends with

the prosecutor until after the trial was over and that feelings for the prosecutor had not influenced his verdict in the case. Defense counsel informed the court that he had an investigator contact seven other jurors about potential juror misconduct and that none of the jurors felt the integrity of the verdict had been compromised. The district court again concluded there was no evidence of juror misconduct.

*Retrospective Competency Hearing*

On September 22, 2014, while his appeal was pending, Jenkins filed a motion in this court "for an order to show cause, or, in the alternative, a remand to the district court, or in the alternative, of clarification." The motion explained that Jenkins had moved for a competency determination before his trial when a letter he wrote prompted jail officials to put him on suicide watch. Jenkins asked this court for an order to show cause why his convictions should not be vacated or, in the alternative, to remand to the district court for clarification on whether there had been an order on his competency. On October 6, 2014, we retained jurisdiction and remanded the case to the district court to resolve the competency issue.

The district court apparently concluded that no competency determination had been made and held a hearing to decide whether a retrospective determination was feasible. The court heard testimony from Pam Bantam-Cooper, the psychologist who conducted a competency evaluation on Jenkins when he initially moved for the competency determination; an expert psychologist; a nurse at the jail where Jenkins was held; the judge who presided over Jenkins' trial; the prosecutor in Jenkins' case; and Jenkins' trial counsel. The court found that a retrospective competency determination was feasible and that Jenkins had been competent at the time of his trial.

11

On appeal, Jenkins presents three issues: (1) the evidence was insufficient to support his convictions of first-degree murder, two counts of aggravated burglary, and theft; (2) the district court erred when it found no evidence of juror misconduct; and (3) the district court erred when it concluded that a retrospective competency hearing was feasible. We address each issue in turn.

ANALYSIS

*Sufficiency of the Evidence*

Jenkins argues there was insufficient evidence to support his convictions of aggravated burglary, theft, and first-degree murder.

When a defendant challenges the sufficiency of the evidence, we review the evidence in a light most favorable to the State and uphold the conviction if we are convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh the evidence or pass on the credibility of witnesses. *State v. Brown*, 306 Kan. 1145, 1157, 401 P.3d 611 (2017) (quoting *State v. Potts*, 304 Kan. 687, Syl. ¶ 1, 374 P.3d 639 [2016]).

"'[A] conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference.'" *Brown*, 306 Kan. at 1157 (quoting *State v. Rosa*, 304 Kan. 429, Syl. ¶ 2, 371 P.3d 915 [2016]).

Aggravated burglary is "without authority, entering into or remaining within any . . . [d]welling in which there is a human being, with intent to commit a felony, theft, or sexually motivated crime therein." K.S.A. 2017 Supp. 21-5807(b).

12

Theft is "with intent to permanently deprive the owner of the possession, use or benefit of the owner's property or services . . . , [o]btaining or exerting unauthorized control over property or services." K.S.A. 2017 Supp. 21-5801.

First-degree murder, under the theories of premeditation and felony murder, is the killing of a human being committed "[i]ntentionally, and with premeditation; or . . . in the commission of, attempt to commit, or flight from any inherently dangerous felony." K.S.A. 2017 Supp. 21-5402(a). Aggravated burglary is an inherently dangerous felony under the statute. K.S.A. 2017 Supp. 21-5402(c)(1)(J).

"A person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime." K.S.A. 21-3205(1).

The district court instructed the jury on each of these crimes and on the theory of aiding and abetting. The jury found Jenkins guilty of aggravated burglary for entering Mack's apartment with the intent to commit a theft therein, aggravated burglary for entering Friedman's apartment with the intent to commit a theft therein, theft of the PlayStation 3, flat screen television, movies, and DVDs from Friedman's apartment, and first-degree murder under theories of premeditation and felony murder for the death of Mack.

Jenkins does not argue that the State failed to show any one element of any of these crimes; he simply makes a general assertion that the evidence was too weak to support the convictions.

13

We disagree. At the very least, when viewed in a light most favorable to the State, there was sufficient evidence to establish that Jenkins aided or abetted Parker and Letourneau in committing the aggravated burglaries and theft, and that Parker shot and killed Mack during the commission of the aggravated burglary in Mack's apartment.

Through witness testimony, the jury heard that the day before Mack died, Jenkins had been expressing worry about his financial situation and Bates told him that he could steal money and drugs from an apartment in the Johnstown complex because the occupants would be out of town. Johnson testified that he talked to Jenkins outside these apartments at approximately 2:50 a.m. and, when Jenkins commented on an open door to Friedman's apartment, Johnson told him that the people there had been partying and were probably asleep.

The evidence established that the crimes occurred shortly after 4:45 a.m. The State introduced testimony that Kendra received a phone call from Jenkins between 4 and 5 a.m. to report that he was "sitting outside the place" and had to get off the phone because he was "about to go handle what he had to handle and would call her back when he got done." Williford testified that 15 to 20 minutes later, Jenkins called Kendra again and said he had done what he was going to do and "got some miscellaneous objects" and told Kendra to meet him back at the house because they "had to get rid of some things." Williford testified that Jenkins also said that "[s]ome things got kicked off" but he "took care of the situation."

Various witnesses testified that Jenkins, Parker, and Letourneau were together before and after the burglaries. Yanik-Ducharme testified that Parker and Letourneau had a television and a PlayStation 3 on the morning on June 13, and Wellman later saw the PlayStation 3 and some DVDs at the residence she shared with Parker. Officers found the

14

PlayStation 3 when they searched Parker's residence and matched it to the serial number on the PlayStation 3 missing from Friedman's apartment.

Kendra told investigators that Jenkins tried to burn his work boots a few days after Mack's death. At trial, when the State introduced a pair of boots that had a sole matching the boot print on Mack's door, Kendra testified that the boots looked like Jenkins' work boots. Police also found a .22 caliber shell casing at the scene of Mack's murder and in the car where Letourneau was found after he had been shot. A forensic scientist testified that those casings were fired from the same weapon. Parker admitted to killing Letourneau, and officers found .22 caliber Super X shells in his residence.

The jury also heard that Jenkins had threatened Kendra and her son on more than one occasion, allegedly because of the information that Kendra knew about the events of June 13, 2009.

Based on this evidence, a reasonable jury could find that Jenkins learned information about Mack's and Friedman's apartments, colluded with Parker, Letourneau, and possibly Graham to burglarize the apartments and steal property from within, and kicked in Mack's door to facilitate the burglary of his apartment. It was also reasonable for the jury to find that Parker shot and killed Mack during that aggravated burglary. We conclude that the evidence was sufficient to find Jenkins guilty of first-degree murder of Mack, aggravated burglary of Mack's and Friedman's apartments, and theft.

*Juror Misconduct*

Next, Jenkins asserts that a juror developed romantic feelings for the prosecutor during the trial and those feelings swayed the juror's verdict, depriving Jenkins of his Sixth Amendment right to a fair trial. Jenkins argues the district court abused its

discretion when it found that juror misconduct did not occur and urges this court to find that juror misconduct occurred, to conclude it deprived him of a fair trial, and to order a new trial.

When considering whether a new trial is warranted based on juror misconduct, the trial court first considers whether juror misconduct created a fundamental failure in the proceeding. *State v. Corey*, 304 Kan. 721, 730, 374 P.3d 654 (2016). If a fundamental failure occurred, the trial court moves to the second step and considers whether the party benefitting from the failure has shown the trial can continue without an injustice, meaning the party has shown beyond a reasonable doubt that the failure did not affect the outcome of the trial. *Corey*, 304 Kan. at 730-31 (citing *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 [2011], *cert. denied* 565 U.S. 1221 [2012]).

An appellate court reviews the trial court's decision in two parts. It reviews the conclusion on whether a fundamental failure occurred for an abuse of discretion. *Corey*, 304 Kan. at 730. The trial court abuses its discretion if its decision

> "(1) is arbitrary, fanciful, or unreasonable, *i.e.,* if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.,* if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.,* if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *Ward*, 292 Kan. at 550.

As for the second question—whether any failure resulted in injustice—an appellate court does not review the district court's decision for abuse of discretion but considers the entire record and performs its own constitutional harmless error review. *Corey*, 304 Kan. at 731.

The Sixth Amendment right to jury trial and the Fourteenth Amendment right to due process guarantee criminal defendants the right to a fair and impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 727-28, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992). Juror misconduct can impair this right and result in a fundamental failure in the trial. See *Corey*, 304 Kan. at 732-34 (concluding there was a fundamental failure in the trial when a juror considered information outside the evidence).

Generally, juror misconduct describes "communications with jurors from outsiders, witnesses, bailiffs, or judges; and actions by jurors in the unauthorized viewing of premises, or reading of newspaper articles." *State v. Fenton*, 228 Kan. 658, 664, 620 P.2d 813 (1980). The term also applies when a juror deceives the court about his or her familiarity with other jurors, witnesses, the parties, or the facts of the case. See, e.g., *State v. Jenkins*, 269 Kan. 334, 338-39, 2 P.3d 769 (2000) (juror misconduct impaired right to fair trial when juror failed to reveal her son had been murdered and that the State's police witnesses helped prosecute son's murderer).

Here, G.M. began sending the prosecutor letters, chocolates, and flowers approximately nine months after the jury returned a verdict. The district court twice considered whether this constituted juror misconduct and twice concluded that it did not.

Jenkins argues that the district court abused its discretion both times because no reasonable person would have agreed with its decision. We are not persuaded.

At the hearings, the district judge heard testimony from the prosecutor and G.M. The prosecutor testified she only knew G.M. because he served as a juror in this case. She testified G.M. made no contact with her during the trial and only started to send her letters and other items after seeing her in the hallway of the courthouse in September 2011. G.M. testified to the same. He also testified he had no feelings for the prosecutor

17

during the trial, showed no bias in the State's favor, and relied on only the evidence to come to a verdict.

We conclude that the district court did not abuse its discretion when it found that no juror misconduct had occurred. G.M. had no personal relationships with the other jurors, the attorneys, or the defendant. The testimony revealed that G.M. did not contact the prosecutor until well after the trial had ended, and that he based his verdict on the evidence. A reasonable person could agree that G.M.'s actions did not constitute misconduct.

Because the district court did not abuse its discretion when it concluded that no juror misconduct occurred, there was no fundamental failure in the trial and no need to move to the second step of the analysis. Accordingly, Jenkins' challenge fails.

*Retrospective Competency Hearing*

Finally, Jenkins argues the district court erred when it found that it could retrospectively determine whether he was competent to stand trial.

We review the district court's decision on the feasibility of a retrospective competency hearing for an abuse of discretion. "A judicial decision amounts to an abuse of discretion when a decision is (1) arbitrary, fanciful, or unreasonable, (2) based on an error of law, (3) or based on an error of fact." *State v. Ford*, 302 Kan. 455, 473, 353 P.3d 1143 (2015).

"'The Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial.'" *Ford*, 302 Kan. at 461

(quoting *Medina v. California*, 505 U.S. 437, 439, 112 S. Ct. 2572, 120 L. Ed. 2d 353 [1992]). To prevent prosecution of incompetent defendants, K.S.A. 22-3302 requires that the court suspend proceedings and hold a hearing on the defendant's competency "[i]f, upon the request of either party . . . the judge before whom the case is pending finds that there is reason to believe that the defendant is incompetent to stand trial."

If the court fails to suspend the proceedings and conduct a competency hearing, a retrospective hearing may rectify the error. *Ford*, 302 Kan. at 471-72. To determine whether it is feasible to retrospectively determine the defendant's competency at the time of the trial, the court considers the following four factors, called the *McGregor* factors:

> "'(1) [T]he passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with defendant before and during trial, including the trial judge, counsel for both the government and defendant, and jail officials. [Citation omitted.]'" *Ford*, 302 Kan. at 471 (quoting *State v. Davis*, 281 Kan. 169, 181, 130 P.3d 69 [2006], *overruled on other grounds* by *Ford*, 302 Kan. 455).

If the court determines a retrospective competency determination would not be feasible, "the procedural violation compels reversal." *Ford*, 302 Kan. at 472.

The district court here concluded that factors one, two, and four weighed in favor of feasibility. It passed no judgment on factor three because the parties presented no evidence on this factor. Based on its conclusions, the court ruled that a retrospective competency hearing was feasible. We conclude that the district court acted within its discretion.

19

*Factor 1:  The passage of time*

When a great amount of time has passed since the defendant's trial, it is less likely that a court can retrospectively determine whether the defendant was competent at the time of the trial. *McGregor v. Gibson*, 248 F.3d 946, 963 (10th Cir. 2001). Contemporaneous medical evidence, or the lack thereof—the focus of the second factor—can shift this factor one way or the other. *Ford*, 302 Kan. at 473; *State v. Murray*, 302 Kan. 478, 485, 353 P.3d 1158 (2015). If this evidence is available, the passage of time is not as detrimental. *Ford*, 302 Kan. at 473 (existence of contemporaneous competency evaluation negated effect of 17 years that passed between trial and retrospective competency determination). But in its absence, even the passage of a short amount of time can signify that a retrospective decision is not feasible. *Davis*, 281 Kan. at 183 (concluding that three years between trial and retrospective competency determination was significant when there was a complete lack of contemporaneous medical evidence); see also *McGregor*, 248 F.3d at 963 (11 years between trial and competency determination, coupled with lack of contemporaneous medical evidence, weighed heavily against conclusion that the retrospective determination was feasible).

This factor supports the district court's determination that the retrospective competency determination was feasible. Approximately four years and seven months passed between Jenkins' motion to determine competency and the district court's competency hearing. This is less time than that which passed in *McGregor* and *Ford*. And, as in *Ford*, the trial court here had the advantage of contemporaneous medical evidence and testimony from people who interacted with Jenkins during and after the trial.

Jenkins disagrees. He argues that this factor does not support the district court's conclusion because the length of time that passed between his trial and his competency

hearing negatively affected Bantam-Cooper's memory. When testifying, Bantam-Cooper reviewed a copy of the competency evaluation form she had completed when she conducted the evaluation. Some questions were left unanswered, and, when prompted, Bantam-Cooper could not remember if they were blank because she had not asked those questions or for some other reason. Bantam-Cooper also could not remember if she had completed another competency evaluation form or just the one submitted as evidence during the hearing.

We find Jenkins' argument unconvincing. The few details that Bantam-Cooper was unable to recall did not prevent her from remembering most of what she learned during her evaluation. And, even if those details hampered her testimony, the court had the advantage of Bantam-Cooper's written evaluation and testimony from the other witnesses. We agree with the district court's conclusion that this factor favors feasibility.

*Factor 2: Availability of contemporaneous medical evidence*

In *Ford*, the second factor weighed in favor of feasibility when there was a contemporaneous competency evaluation that noted the defendant's psychiatric history and detailed his ability to understand the proceedings and their consequences and assist in his own defense. *Ford*, 302 Kan. at 473.

In *Murray*, the availability of a doctor's contemporaneous competency determination swayed this factor in favor of the State, even though the written explanation was brief and the doctor did not clarify which test he used in conducting the evaluation. 302 Kan. at 485-86. The defendant contended that the lack of certain details in the competency determination and the doctor's failure to identify which test he used rendered the medical evidence unhelpful. We disagreed, based on our observation that there is no statutory requirement that an expert perform *any* evaluation. 302 Kan. at 486.

21

Again, we conclude that this factor supports the district court's ruling. The court had a plethora of contemporaneous medical evaluation at its disposal. Bantam-Cooper, a licensed psychotherapist, performed a competency evaluation when Jenkins first requested a competency determination. At the competency hearing, the parties provided a copy of the questionnaire Bantam-Cooper used and a letter that detailed her final conclusion that Jenkins was competent to stand trial. The court also had the questionnaire Bantam-Cooper used to evaluate Jenkins' risk of suicide with Bantam-Cooper's notes about Jenkins' answers to the questions, a letter from Bantam-Cooper to the jail detailing her final conclusions about Jenkins' risk of suicide, and the letter Jenkins wrote that compelled the suicide watch. Finally, Bantam-Cooper was present to testify about her evaluations.

Jenkins insists that this factor weighs against feasibility because the written questionnaire Bantam-Cooper used to conduct her competency evaluation was incomplete. While Jenkins is correct that the form is incomplete, as we noted in *Murray*, there was no statutory requirement that an expert perform any evaluation, let alone perform it in a certain way.

The district court here had at least as much contemporaneous medical evidence before it as did the district courts in *Ford* and in *Murray*. For this reason, we conclude the second factor weighs in support of the district court's conclusion.

*Factor 3:  Availability of defendant's statements in trial record*

Because the parties presented no evidence regarding this factor, we do not include it in our review.

22

*Factor 4: Availability of witnesses*

The final factor strongly supports the district court's ruling. Six witnesses, all of whom had interaction with Jenkins around the time of his trial, testified during the hearing: the nurse at the jail where Jenkins was held, Jenkins' trial attorney, the prosecutor, the judge who presided over Jenkins' trial, Bantam-Cooper, and an expert psychologist. The testimony of Jenkins' trial counsel was especially helpful. As we noted in *Ford*, "'[d]efense counsel is often in the best position to determine whether a defendant's competency is questionable.'" 302 Kan. at 474 (quoting *McGregor*, 248 F.3d at 960).

Jenkins argues that the witness' testimony did not assist the court in making a retrospective determination because the facts contradicted their assertions that Jenkins was competent to stand trial. Essentially, Jenkins argues that the falsehood of the witness' testimony makes a retrospective competency hearing unfeasible.

We are not persuaded by Jenkins' argument. The veracity of a witness' testimony is not the proper measure for considering whether this factor weighs for feasibility. The proper measure is the availability of the testimony. Furthermore, Jenkins is making a credibility argument, and it is not our role to assess the credibility of a witness. *State v. McReynolds*, 288 Kan. 318, 326, 202 P.3d 658 (2009).

The district court was able to hear testimony from multiple witnesses who interacted with Jenkins before, during, and after his trial. As a result, this factor weighs heavily in support of its conclusion that a retrospective determination was feasible.

23

Based on our review of the evidence presented, the district court did not abuse its discretion when it concluded it could make a retrospective competency determination on Jenkins' competency at the time of his trial.

Affirmed.