NOT DESIGNATED FOR PUBLICATION

No. 125,771

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRENT TYRELL ALEXANDER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Finney District Court; WENDEL W. WURST, judge. Submitted without oral argument. Opinion filed May 24, 2024. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Tamara S. Hicks*, assistant county attorney, *Susan H. Richmeier*, county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., ATCHESON, J., and TIMOTHY G. LAHEY, S.J.

PER CURIAM:  A jury sitting in Finney County District Court convicted Brent Alexander of aggravated assault, criminal threat, stalking, and criminal trespass based on a series of antagonistic voice and text messages he sent to his former girlfriend and a later confrontation in the driveway of her home when he pointed a handgun at her. Alexander has challenged the verdicts on multiple grounds. Although the trial was untidy in several respects, untidiness is not the same as impermissible unfairness. See *State v. Cruz*, 297 Kan. 1048, 1075, 307 P.3d 199 (2013) (recognizing long-standing rule criminal

1

defendants entitled to fair trials not perfect trials). We, therefore, affirm the convictions and resulting sentences.

FACTUAL AND PROCEDURAL HISTORY

Alexander and Tasha Mulligan-Rose had an intermittent and apparently volatile relationship during the two years leading up to the circumstances in late November 2021 that gave rise to this case. About 7 p.m. on a Sunday, Garden City Police Officers Julian Garcia and Samantha Urias were dispatched to Mulligan-Rose's neighborhood in response to a call about a fight in progress. Based on the dispatch, the report may have concerned another incident. In any event, the two officers found a distraught Mulligan-Rose standing in her driveway with her neighbor Sharenaann Reid. Other officers were elsewhere in the neighborhood.

Mulligan-Rose told the officers she had broken up with Alexander about a month earlier and indicated their relationship had been on-again, off-again for about two years. She explained to the officers that while she was in the driveway with Reid, Alexander drove up in a white SUV and stepped out of the vehicle as he yelled at her. Mulligan-Rose said she told Alexander to leave. He got back in the SUV and then raised a black handgun with a flashlight taped to the barrel, pointed it at her, and told her he would kill her if it was the last thing he did. Alexander then drove away. During the jury trial, Officer Urias described Mulligan-Rose as shaking and visibly upset as they spoke in front of the house.

Reid essentially confirmed Mulligan-Rose's account of the incident to the officers. At trial, Reid testified that she thought Alexander was holding a handgun along with the flashlight but conceded she could not be sure what the object was because the beam from the flashlight reflected off the SUV's windshield, obscuring her view. Reid said

2

Alexander pointed the flashlight and the other object only at Mulligan-Rose and loudly threatened Mulligan-Rose.

Mulligan-Rose told the officers that Alexander had sent her numerous threatening voicemails and text messages over the preceding several days. Officer Urias viewed the text messages on Mulligan-Rose's smartphone. And Mulligan-Rose later sent screenshots of the text messages and copies of the voicemail messages to Officer Urias, who then saved them as part of her investigation. According to Mulligan-Rose, the messages she received were from a telephone number she knew to be Alexander's and a few contained personal information only her family and some of her close friends would know. She also told Officer Urias she recognized Alexander's voice on the oral messages. Officer Urias recounted that information during the jury trial and described the text messages as "very threatening" and "demeaning." Officer Urias testified that in some of the text messages, the sender threatened to kill Mulligan-Rose. She told the jurors specific text messages stated:  "'You're dead.'"; "'I'm going to kill you.'"; and "'I wish I had a gun right about now.'"

Based on the communications sent to Mulligan-Rose and the interaction she described with Alexander in her driveway, the State charged Alexander with the four crimes:

• Aggravated assault, a severity level 7 person felony violation of K.S.A. 21-5412. The jurors were instructed that to convict Alexander they had to find he placed Mulligan-Rose "in reasonable apprehension of immediate bodily harm" using "a deadly weapon."

• Criminal threat, a severity level 9 person felony violation of K.S.A. 21-5415. The jurors were instructed that to convict Alexander they had to find he communicated "a threat of violence" with the intent to place Mulligan-Rose in fear.

• Stalking, a class A person misdemeanor violation of K.S.A. 21-5427(a)(1). The jurors were instructed that to convict Alexander they had to find he acted "with a continuity of purpose" in sending "at least three text messages including content of domestic violence" to Mulligan-Rose knowing they "would place [her] in fear for her safety."

• Criminal trespass, a class B nonperson misdemeanor violation of K.S.A. 21-5808(a)(1). The statute requires that a defendant "enters or remains" on the property "in defiance of an order not to enter or to leave . . . personally communicated . . . by the owner thereof or other authorized person." The jurors were instructed that to convict Alexander they had to find: (1) He "entered or remained on" the property where Mulligan-Rose resided; (2) he "knew he was not authorized to do so"; and (3) he had been "given a warning not to go on . . . the property by [a] Garden City Police Officer."

During the two-day jury trial in April 2022, the State called Mulligan-Rose, Reid, and Officers Urias and Garcia, among others, as witnesses. Alexander testified in his own defense and simply told the jurors he had no contact with Mulligan-Rose by voice or text message or in person on the dates the State alleged the crimes occurred. He was not cross-examined and presented no other evidence. The jurors found Alexander guilty of all four charges.

At a later hearing, the district court sentenced Alexander to serve 32 months in prison on the aggravated assault conviction followed by 12 months of postrelease supervision, a standard guidelines punishment given his criminal history, and imposed concurrent terms of incarceration on the other convictions. Alexander does not dispute the sentences.

Alexander has raised an array of issues on appeal. We take them up serially, augmenting our general factual and procedural outline as necessary.

First, Alexander contends the district court should have instructed the jury on simple assault, a misdemeanor, as a lesser included offense of the aggravated assault charge because the trial evidence about the handgun was equivocal. Under K.S.A. 22-3414, a district court is obligated to instruct on a lesser included offense if "some evidence" admitted at trial "would reasonably justify" a guilty verdict on that offense. Appellate courts use a sequential inquiry to assess a claimed instructional error and consider: (1) reviewability entailing preservation of the issue at trial and jurisdiction; (2) the legal appropriateness of the instruction; (3) the factual support in the evidence for the instruction; and (4) the harmlessness of any actual error. *State v. Craig*, 311 Kan. 456, 464, 462 P.3d 173 (2020); *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

On the first consideration, Alexander did not request an instruction on simple assault. Although Alexander's failure does not preclude appellate review, we impose a stringent "clear error" standard as a result. Because simple assault is a lesser included crime of aggravated assault, the instruction would be legally appropriate. The only difference is the aggravating factor—the defendant has used a deadly weapon to induce the apprehension of bodily harm. The Kansas Supreme Court recently held that when the State has introduced sufficient evidence establishing each element of an aggravated assault charge, thereby simultaneously establishing the elements of simple assault, an instruction on simple assault is factually appropriate. *State v. Lowe*, 317 Kan. 713, 720, 538 P.3d 1094 (2023). We fail to see a readily apparent distinction between legal and factual appropriateness in that circumstance. The holding in *Lowe* governs here, although the district court did not have the benefit of the decision when Alexander went to trial. In

5

short, the district court should have instructed the jury on simple assault as a lesser included offense.

Under the applicable clear error standard, we must be "firmly convinced" the jury would have reached a different result had the district court provided an instruction on simply assault. *State v. Couch*, 317 Kan. 566, 590, 533 P.3d 630 (2023). Given that high bar, we cannot say Alexander has offered a convincing basis for relief. Mulligan-Rose identified the object in Alexander's hand, along with the flashlight, as a handgun. Reid agreed Alexander was holding a flashlight and a second object, although she could not say categorically that it was a firearm. As Alexander pointed the flashlight and whatever else he had in his hand at Mulligan-Rose, he threatened to kill her—repeating earlier threats he had made—circumstantially suggesting the object entailed a means of immediately carrying out the deadly threat. Finally, Alexander offered no alternative explanation of what the object might have been, since he denied being at Mulligan-Rose's house, a denial the jury obviously found less than credible. We are unpersuaded the jury would have come to a different conclusion were it given the option of considering a simple assault charge along with the aggravated assault charge.

Alexander next contends the State offered insufficient evidence at trial that he was without authorization to be at Mulligan-Rose's house, thereby requiring reversal of his conviction for criminal trespassing. In this context, an appellate court construes the evidence in a light most favorable to the party prevailing in the district court, here the State, and in support of the jury's verdict. And the court will neither reweigh the evidence generally nor make credibility determinations specifically. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021); *State v. Jenkins*, 308 Kan. 545, Syl. ¶ 1, 422 P.3d 72 (2018); *State v. Butler*, 307 Kan. 831, 844-45, 416 P.3d 116 (2018); *State v. Pham*, 281 Kan. 1227, 1252, 136 P.3d 919 (2006). The issue for review is simply whether rational jurors could have found the defendant guilty beyond a reasonable doubt. *Butler*, 307 Kan. at 844-45.

Mulligan-Rose testified at trial that she unequivocally told Alexander to leave the property when he drove up and parked in the driveway. Her directive established Alexander was without authority to remain on the property. Alexander contends the State failed to show that Mulligan-Rose was an "owner" of the residence consistent with the statutory language. The word "owner" is a defined term in the criminal code and means "a person who has any interest in property." K.S.A. 21-5111(s). Mulligan-Rose was not directly asked during the trial whether she owned or rented the house where she lived. Either way, she would have had a recognized property interest. The evidence also showed she had lived there for an extended period, undercutting some notion she was a squatter with no legal right of possession. The elements of a crime may be proved with circumstantial evidence. *State v. Douglas*, 313 Kan. 704, 716, 490 P.3d 34 (2021); *State v. Thach*, 305 Kan. 72, 84, 378 P.3d 522 (2016). We find this aspect of Alexander's argument unpersuasive.

But Alexander also challenges the sufficiency of the evidence showing that a Garden City police officer had given him a "criminal trespass warning." We presume the warning to be a written notice to Alexander that he was not authorized to go on the property where Mulligan-Rose lived and informing him he could be charged with trespassing for doing so. See *State v. Acevado*, 49 Kan. App. 2d 655, 656-57, 315 P.3d 261 (2013) (describing "trespass warning" manager of retail store claimed to have presented to customer). The elements instruction identified the warning as something the State had to prove to convict Alexander of criminal trespass.

Officer Urias testified both that the police dispatcher informed her that such a warning had been issued and that she had seen an electronic copy of a warning Alexander signed in December 2020. Alexander lodged no objection to Officer Urias' testimony. Although the State's approach to proving the trespass warning may be characterized as lax, it was sufficient to establish the existence of such a warning, especially absent a contemporaneous trial objection. See K.S.A. 60-404. That said, we are puzzled by what

7

relevance the trespass warning had to the crime and why it was included as an element for the jury's consideration. We presume it was issued in December 2020 after one of the periodic breakups Mulligan-Rose and Alexander experienced. Since then, they reunited and had again broken up a month before the confrontation in the driveway. So it's less than clear the trespass warning had any continuing legal effect by the time Alexander confronted Mulligan-Rose in November 2021.

In short, however, the evidence sufficiently established Alexander remained in the driveway after Mulligan-Rose ordered him to leave. That showed Alexander was without authority to remain on the premises.

In a related argument, Alexander contends the elements instruction on criminal trespass was legally insufficient because it failed to require the jury to find that the police officer issuing the trespass warning had the legal authority to do so. We suppose Alexander is technically correct, even though the State had no obligation to prove the trespassing warning in the first place to convict Alexander. The trespass warning became an element presented for the jury's consideration. But Alexander did not object to the instruction in the district court. So we review for clear error.

The Kansas Supreme Court has recognized there is no clear error if the trial evidence bearing on an omitted element was "overwhelming and was never directly contested." *State v. Jarmon*, 308 Kan. 241, 245-46, 419 P.3d 591 (2018). Alexander never disputed his receipt of the trespass warning, and nothing in the trial record suggested that Mulligan-Rose had not requested he be given the warning. We find that sufficient to affirm the criminal trespass conviction under the clear error standard outlined and applied in *Jarmon*.

On appeal, Alexander next asserts the State failed to lay sufficient evidentiary foundations to admit the contents of the voicemail and text messages Mulligan-Rose

received and attributed to him. That is, he says the messages were insufficiently authenticated. If the text messages were improperly admitted, the error would directly undermine the guilty verdict on the stalking charge. More broadly, the evidence bore on Alexander's unlawful intent in carrying out an aggravated assault and making a criminal threat.

In general, a district court's decision to admit or exclude a particular piece of evidence that is otherwise material entails the exercise of judicial discretion. *State v. Shields*, 315 Kan. 814, 831-32, 511 P.3d 931 (2022). A district court exceeds that discretion if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. *State v. Darrah*, 309 Kan. 1222, 1227, 442 P.3d 1049 (2019); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011). Alexander, as the party asserting an abuse of judicial discretion, bears the burden of proving the point. See *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018).

Authentication is addressed in K.S.A. 60-464 and simply requires a showing of authenticity: The proffered evidence is what it purports to be. K.S.A. 60-464(a) (The evidentiary foundation must be "sufficient to support a finding that the item is what the proponent claims it is."); *State v. Robinson*, 303 Kan. 11, 225, 363 P.3d 875 (2015), *disapproved on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017). Authentication, as a rule of admissibility, presents a comparatively low threshold that may be satisfied with limited direct or circumstantial evidence. *Robinson*, 303 Kan. at 225. If an item has been authenticated, disputes about its meaning or legal significance go to the weight a fact-finder may give that evidence rather than its admissibility. 303 Kan. at 226.

9

Here, Mulligan-Rose identified the voice on the oral messages as Alexander's and knew the telephone number from which the messages originated to be one he used. One of the messages referred to personal information Mulligan-Rose had shared with only close friends and family. All of that was more than enough to authenticate those messages. K.S.A. 60-464(b)(5). Similarly, the text messages came from a number Mulligan-Rose knew to be Alexander's, and many were consistent in content with the threatening voice messages and Alexander's conduct in the driveway. Again, that was sufficient to admit the text messages as evidence. The State undoubtedly could have provided a more comprehensive evidentiary foundation. But the test for admissibility does not require comprehensiveness or even corroboration of an otherwise minimally sufficient foundation.

For his next point on appeal, Alexander asserts a factual misstatement in the prosecutor's closing argument irreparably tainted the trial and required reversal of the jury verdicts. We, again, are unpersuaded. While arguing the case to the jurors, the prosecutor said Alexander denied sending either the text or voice messages to Mulligan-Rose but did not deny going to her house. The record shows Alexander testified he did not contact Mulligan-Rose either in person or by any sort of messaging. Alexander's lawyer lodged an immediate objection to the prosecutor's erroneous remark. Rather than directly ruling on the objection, the district court told the jurors to rely on their "collective memory" of Alexander's testimony.

While lawyers have considerable latitude in arguing their clients' cause to jurors at the end of a trial, they may not misrepresent the law or the evidence. A prosecutor commits error in doing so. See *State v. Davis*, 306 Kan. 400, 413-14, 394 P.3d 817 (2017) (prosecutorial error to misstate either law or evidence in closing argument). Here, the prosecutor erred in materially misrepresenting Alexander's testimony.

10

Appellate courts examine that sort of prosecutorial error using the test first outlined in *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). See *State v. Anderson*, 318 Kan. 425, 437, 543 P.3d 1120 (2024) (recognizing and applying *Sherman* test). The *Sherman* test first considers whether an error has occurred and then weighs any prejudice to the defendant resulting from the error. Prejudice should be measured against the standard in *Ward*, 292 Kan. 541, Syl. ¶ 6, for a constitutional wrong. So the State, as the party benefiting from the error, must demonstrate "'beyond a reasonable doubt'" that the mistake "'did not affect the outcome of the trial'" taking account of the full trial record. *Sherman*, 305 Kan. at 109 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6). That is, the appellate court must determine if the error deprived the defendant of a fair trial—a constitutional protection rooted both in due process and in the right to trial itself. *Sherman*, 305 Kan. at 98-99, 109.

We find beyond any reasonable doubt the prosecutor's isolated misstatement did not compromise Alexander's right to a fair trial. The jurors heard the testimony, including Alexander's denial, and we are confident their collective memory did, indeed, accurately reflect the evidence. The jurors, in turn, had ample grounds to discount Alexander's denial that he showed up at Mulligan-Rose's house in the face of the contrary testimony from both Mulligan-Rose and Reid.

Finally, Alexander claims cumulative trial errors deprived him of a fair proceeding. Appellate courts will weigh the collective impact of trial errors and may grant relief if their aggregated impact has deprived the defendant of a fair hearing even when the errors considered individually would not necessarily require reversal of a conviction. *State v. Harris*, 310 Kan. 1026, 1041, 453 P.3d 1172 (2019); *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). An appellate court examines the entire trial record to assess the effect of multiple trial errors. 301 Kan. at 167-68. The assessment entails "how the trial judge dealt with the errors as they arose; the nature and

number of errors and their interrelationship, if any; and the overall strength of the evidence." *State v. Miller*, 308 Kan. 1119, 1176, 427 P.3d 907 (2018).

We have identified two errors: The district court's failure to instruct on simple assault as a lesser included crime of aggravated assault and the prosecutor's one misstatement of the evidence in closing argument. But, as we have found, the instructional mistake was not preserved in the district court and did not rise to the level of clear error. The Kansas Supreme Court recently held that such an error should not be included in an appellate determination of cumulative error. *State v. Waldschmidt*, 318 Kan. 633, 662, 546 P.3d 716 (2024). Alexander has, therefore, presented only one error that may be considered. Obviously, there can be no cumulative error in that circumstance. *State v. George*, 311 Kan. 693, 709-10, 466 P.3d 469 (2020).

Affirmed.